## ON LEE v. UNITED STATES.

No. 543.   Argued April 24, 1952.—Decided June 2, 1952.

748

*Gilbert S. Rosenthal* argued the cause for petitioner. With him on the brief was *Henry K. Chapman.*

*Robert S. Erdahl* argued the cause for the United States. With him on the brief were *Solicitor General Perlman* and *Assistant Attorney General McInerney.*

MR. JUSTICE JACKSON delivered the opinion of the Court.

Petitioner was convicted on a two-count indictment, one charging the substantive offense of selling a pound of opium in violation of 21 U. S. C. §§ 173 and 174, the other conspiring to sell the opium in violation of 18 U. S. C. § 371. The Court of Appeals sustained the conviction by a divided court.[1] We granted certiorari.[2]

The questions raised by petitioner have been considered but only one is of enough general interest to merit discussion. That concerns admission in evidence of two conversations petitioner had, while at large on bail pend-

---

[1] 193 F. 2d 306.
[2] 342 U. S. 941.

ing trial, with one Chin Poy. The circumstances are these:

Petitioner, On Lee, had a laundry in Hoboken. A customers' room opened on the street, back of it was a room for ironing tables, and in the rear were his living quarters. Chin Poy, an old acquaintance and former employee, sauntered in and, while customers came and went, engaged the accused in conversation in the course of which petitioner made incriminating statements. He did not know that Chin Poy was what the Government calls "an undercover agent" and what petitioner calls a "stool pigeon" for the Bureau of Narcotics. Neither did he know that Chin Poy was wired for sound, with a small microphone in his inside overcoat pocket and a small antenna running along his arm. Unbeknownst to petitioner, an agent of the Narcotics Bureau named Lawrence Lee had stationed himself outside with a receiving set properly tuned to pick up any sounds the Chin Poy microphone transmitted. Through the large front window Chin Poy could be seen and through the receiving set his conversation, in Chinese, with petitioner could be heard by agent Lee. A few days later, on the sidewalks of New York, another conversation took place between the two, and damaging admissions were again "audited" by agent Lee.

For reasons left to our imagination, Chin Poy was not called to testify about petitioner's incriminating admissions. Against objection,[3] however, agent Lee was al-

---

[3] It seems probable that petitioner failed to properly object to agent Lee's testimony. Shortly after agent Lee began to testify, petitioner's counsel addressed the court: ". . . I would like to enter a general objection to testimony by this witness of conversations alleged to have been had between Agent Gim and Gong not in the hearing of the defendant on trial or in his presence." This objection is not even addressed to the testimony describing the conversation between On Lee and Chin Poy. Later, when agent

lowed to relate the conversations as heard with aid of his receiving set.   Of this testimony, it is enough to say that it was certainly prejudicial if its admission was improper.

Petitioner contends that this evidence should have been excluded because the manner in which it was ob-

---

Lee started to describe the conversation between On Lee and Chin Poy, petitioner's counsel said, "That is objected to."   At best this is a general objection which is insufficient to preserve such a specific claim as violation of a constitutional provision in obtaining the evidence.   Wigmore on Evidence, § 18 (C) (1).   Some jurisdictions recognize an exception to the rule that an overruled general objection cannot avail proponent on appeal in the case where it appears on the face of the evidence that it is admissible for no purpose whatever, or where the nature of the precise specific objection which could be made is readily discernible.   *Sparks* v. *Territory of Oklahoma,* 146 F. 371.   But this exception is generally confined to the cases where such evidence was plainly irrelevant.   Where, as in this case, the objection relies on collateral matter to show inadmissibility, and in addition the exclusionary rule to be relied on involves interpretation of the Constitution, the orthodox rule of evidence requiring specification of the objection is buttressed by the uniform policy requiring constitutional questions to be raised at the earliest possible stage in the litigation.

To call the objection a general one is to put it in the light most favorable to petitioner; later colloquy between counsel and court indicates that the intended ground of that objection was irrelevance. There were in addition motions to dismiss the indictment on each count, and to exclude certain other testimony, but no reference to the testimony here in question at the motion stage.   There was no motion for a new trial, but there was a motion to set aside the verdict—but still no mention of the search-and-seizure argument for exclusion.   There is not even any mention of it in the statement of points to be relied on in the Court of Appeals.   The Court of Appeals, however, does treat it fully, presumably under Rule 52 (b) of the Rules of Criminal Procedure, allowing the appellate court to notice "plain error."   Though we think the Court of Appeals would have been within its discretion in refusing to consider the point, their having passed on it leads us to treat the merits also.

tained violates both the search-and-seizure provisions of the Fourth Amendment,[4] and § 605 of the Federal Communications Act (47 U. S. C. § 605); [5] and, if not rejected on those grounds, we should pronounce it inadmissible anyway under the judicial power to require fair play in federal law enforcement.

The conduct of Chin Poy and agent Lee did not amount to an unlawful search and seizure such as is proscribed by the Fourth Amendment. In *Goldman* v. *United States,* 316 U. S. 129, we held that the action of federal agents in placing a detectaphone on the outer wall of defendant's hotel room, and thereby overhearing conversations held within the room, did not violate the Fourth Amendment. There the agents had earlier committed a trespass in order to install a listening device within the room itself. Since the device failed to work, the Court expressly reserved decision as to the effect on the search-and-seizure question of a trespass in that situation. Petitioner in the instant case has seized upon that dictum, apparently on the assumption that the presence of a radio set would automatically bring him within the reservation if he can show a trespass.

But petitioner cannot raise the undecided question, for here no trespass was committed. Chin Poy entered a place of business with the consent, if not by the implied

---

[4] "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U. S. Const., Amend. IV.

[5] ". . . no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person . . . ."

invitation, of the petitioner. Petitioner contends, however, that Chin Poy's subsequent "unlawful conduct" vitiated the consent and rendered his entry a trespass *ab initio.*

If we were to assume that Chin Poy's conduct was unlawful and consider this argument as an original proposition, it is doubtful that the niceties of tort law initiated almost two and a half centuries ago by the case of the *Six Carpenters,* 8 Coke 146 (a), cited by petitioner, are of much aid in determining rights under the Fourth Amendment. But petitioner's argument comes a quarter of a century too late: this contention was decided adversely to him in *McGuire* v. *United States,* 273 U. S. 95, 98, 100, where Mr. Justice Stone, speaking for a unanimous Court, said of the doctrine of trespass *ab initio:* "This fiction, obviously invoked in support of a policy of penalizing the unauthorized acts of those who had entered under authority of law, has only been applied as a rule of liability in civil actions against them. Its extension is not favored." He concluded that the Court would not resort to "a fiction whose origin, history, and purpose do not justify its application where the right of the government to make use of evidence is involved." This was followed in *Zap* v. *United States,* 328 U. S. 624, 629.

By the same token, the claim that Chin Poy's entrance was a trespass because consent to his entry was obtained by fraud must be rejected. Whether an entry such as this, without any affirmative misrepresentation, would be a trespass under orthodox tort law is not at all clear. See Prosser on Torts, § 18. But the rationale of the *McGuire* case rejects such fine-spun doctrines for exclusion of evidence. The further contention of petitioner that agent Lee, outside the laundry, was a trespasser because by these aids he overheard what went on inside verges on the frivolous. Only in the case of physical entry, either

by force, as in *McDonald* v. *United States,* 335 U. S. 451, by unwilling submission to authority, as in *Johnson* v. *United States,* 333 U. S. 10, or without any express or implied consent, as in *Nueslein* v. *District of Columbia,* 73 App. D. C. 85, 115 F. 2d 690, would the problem left undecided in the *Goldman* case be before the Court.

Petitioner relies on cases relating to the more common and clearly distinguishable problems raised where tangible property is unlawfully seized. Such unlawful seizure may violate the Fourth Amendment, even though the entry itself was by subterfuge or fraud rather than force. *United States* v. *Jeffers,* 342 U. S. 48; *Gouled* v. *United States,* 255 U. S. 298 (the authority of the latter case is sharply limited by *Olmstead* v. *United States,* 277 U. S. 438, at 463). But such decisions are inapposite in the field of mechanical or electronic devices designed to overhear or intercept conversation, at least where access to the listening post was not obtained by illegal methods.

Petitioner urges that if his claim of unlawful search and seizure cannot be sustained on authority, we reconsider the question of Fourth Amendment rights in the field of overheard or intercepted conversations. This apparently is upon the theory that since there was a radio set involved, he could succeed if he could persuade the Court to overturn the leading case holding wiretapping to be outside the ban of the Fourth Amendment, *Olmstead* v. *United States,* 277 U. S. 438, and the cases which have followed it. We need not consider this, however, for success in this attempt, which failed in *Goldman* v. *United States,* 316 U. S. 129, would be of no aid to petitioner unless he can show that his situation should be treated as wiretapping. The presence of a radio set is not sufficient to suggest more than the most attenuated analogy to wiretapping. Petitioner was talking confidentially and indiscreetly with one he trusted, and he

was overheard. This was due to aid from a transmitter and receiver, to be sure, but with the same effect on his privacy as if agent Lee had been eavesdropping outside an open window. The use of bifocals, field glasses or the telescope to magnify the object of a witness' vision is not a forbidden search or seizure, even if they focus without his knowledge or consent upon what one supposes to be private indiscretions. It would be a dubious service to the genuine liberties protected by the Fourth Amendment to make them bedfellows with spurious liberties improvised by farfetched analogies which would liken eavesdropping on a conversation, with the connivance of one of the parties, to an unreasonable search or seizure. We find no violation of the Fourth Amendment here.

Nor do the facts show a violation of § 605 of the Federal Communications Act. Petitioner had no wires and no wireless. There was no interference with any communications facility which he possessed or was entitled to use. He was not sending messages to anybody or using a system of communications within the Act. *Goldstein* v. *United States,* 316 U. S. 114.

Finally, petitioner contends that even though he be overruled in all else, the evidence should be excluded as a means of disciplining law enforcement officers. Cf. *McNabb* v. *United States,* 318 U. S. 332. In *McNabb,* however, we held that, where defendants had been unlawfully detained *in violation of the federal statute requiring prompt arraignment before a commissioner,* a confession made during the detention would be excluded as evidence in federal courts even though not inadmissible on the ground of any otherwise involuntary character. But here neither agent nor informer violated any federal law; and violation of state law, even had it been shown here, as it was not, would not render the evidence

obtained inadmissible in federal courts. *Olmstead* v. *United States,* 277 U. S. 438, at 468.

In order that constitutional or statutory rights may not be undermined, this Court has on occasion evolved or adopted from the practice of other courts exclusionary rules of evidence going beyond the requirements of the constitutional or statutory provision. *McNabb* v. *United States, supra; Weeks* v. *United States,* 232 U. S. 383. In so doing, it has, of course, departed from the common-law rule under which otherwise admissible evidence was not rendered inadmissible by the fact that it had been illegally obtained. Such departures from the primary evidentiary criteria of relevancy and trustworthiness must be justified by some strong social policy. In discussing the extension of such rules, and the creation of new ones, it is well to remember the remarks of Mr. Justice Stone in *McGuire* v. *United States,* 273 U. S. 95, at 99: "A criminal prosecution is more than a game in which the Government may be checkmated and the game lost merely because its officers have not played according to rule."

Rules of evidence, except where prescribed by statute, are formulated by the courts to some extent, as "a question of sound policy in the administration of the law." *Zucker* v. *Whitridge,* 205 N. Y. 50, 65, 98 N. E. 209, 213. Courts which deal with questions of evidence more frequently than we do have found it unwise to multiply occasions when the attention of a trial court in a criminal case must be diverted from the issue of the defendant's guilt to the issue of someone else's misconduct in obtaining evidence. They have considered that "The underlying principle obviously is that the court, when engaged in trying a criminal cause, will not take notice of the manner in which witnesses have possessed themselves of papers, or other articles of personal property, which

are material and properly offered in evidence." *People* v. *Adams,* 176 N. Y. 351, 358, 68 N. E. 636, 638. However, there is a procedure in federal court by which defendant may protect his right in advance of trial to have returned to him evidence unconstitutionally obtained. *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385. But since we hold here that there was no violation of the Constitution, such a remedy could not be invoked. Exclusion would have to be based on a policy which placed the penalizing of Chin Poy's breach of confidence above ordinary canons of relevancy. For On Lee's statements to Chin Poy were admissions against interest provable against him as an exception to the hearsay rule. The normal manner of proof would be to call Chin Poy and have him relate the conversation. We can only speculate on the reasons why Chin Poy was not called. It seems a not unlikely assumption that the very defects of character and blemishes of record which made On Lee trust him with confidences would make a jury distrust his testimony. Chin Poy was close enough to the underworld to serve as bait, near enough the criminal design so that petitioner would embrace him as a confidante, but too close to it for the Government to vouch for him as a witness. Instead, the Government called agent Lee. We should think a jury probably would find the testimony of agent Lee to have more probative value than the word of Chin Poy.

Society can ill afford to throw away the evidence produced by the falling out, jealousies, and quarrels of those who live by outwitting the law. Certainly no one would foreclose the turning of state's evidence by denizens of the underworld. No good reason of public policy occurs to us why the Government should be deprived of the benefit of On Lee's admissions because he made them to a confidante of shady character.

The trend of the law in recent years has been to turn away from rigid rules of incompetence, in favor of admitting testimony and allowing the trier of fact to judge the weight to be given it. As this Court has pointed out: " 'Indeed, the theory of the common law was to admit to the witness stand only those presumably honest, appreciating the sanctity of an oath, unaffected as a party by the result, and free from any of the temptations of interest. The courts were afraid to trust the intelligence of jurors. But the last fifty years have wrought a great change in these respects, and to-day the tendency is to enlarge the domain of competency and to submit to the jury for their consideration as to the credibility of the witness those matters which heretofore were ruled sufficient to justify his exclusion. This change has been wrought partially by legislation and partially by judicial construction.' " *Funk* v. *United States,* 290 U. S. 371, 376.

The use of informers, accessories, accomplices, false friends, or any of the other betrayals which are "dirty business" may raise serious questions of credibility. To the extent that they do, a defendant is entitled to broad latitude to probe credibility by cross-examination and to have the issues submitted to the jury with careful instructions. But to the extent that the argument for exclusion departs from such orthodox evidentiary canons as relevancy and credibility, it rests solely on the proposition that the Government shall be arbitrarily penalized for the low morals of its informers. However unwilling we as individuals may be to approve conduct such as that of Chin Poy, such disapproval must not be thought to justify a social policy of the magnitude necessary to arbitrarily exclude otherwise relevant evidence. We think the administration of justice is better served if stratagems such as we have here are regarded as raising,

not questions of law, but issues of credibility. We cannot say that testimony such as this shall, as a matter of law, be refused all hearing.

*Judgment affirmed.*

· MR. JUSTICE BLACK believes that in exercising its supervisory authority over criminal justice in the federal courts (see *McNabb* v. *United States,* 318 U. S. 332, 341) this Court should hold that the District Court should have rejected the evidence here challenged.

MR. JUSTICE FRANKFURTER, dissenting.

The law of this Court ought not to be open to the just charge of having been dictated by the "odious doctrine," as Mr. Justice Brandeis called it, that the end justifies reprehensible means. To approve legally what we disapprove morally, on the ground of practical convenience, is to yield to a short-sighted view of practicality. It derives from a preoccupation with what is episodic and a disregard of long-run consequences. The method by which the state chiefly exerts an influence upon the conduct of its citizens, it was wisely said by Archbishop William Temple, is "the moral qualities which it exhibits in its own conduct."

Loose talk about war against crime too easily infuses the administration of justice with the psychology and morals of war. It is hardly conducive to the soundest employment of the judicial process. Nor are the needs of an effective penal code seen in the truest perspective by talk about a criminal prosecution's not being a game in which the Government loses because its officers have not played according to rule. Of course criminal prosecution is more than a game. But in any event it should not be deemed to be a dirty game in which "the dirty business" of criminals is outwitted by "the dirty business" of law officers. The contrast between morality professed

by society and immorality practiced on its behalf makes for contempt of law. Respect for law cannot be turned off and on as though it were a hot-water faucet.

It is a quarter century since this Court, by the narrowest margin, refused to put wiretapping beyond the constitutional pale where a fair construction of the Fourth Amendment should properly place it. Since then, instead of going from strength to strength in combatting crime, we have gone from inefficiency to inefficiency, from corruption to corruption. The moral insight of Mr. Justice Brandeis unerringly foresaw this inevitability. "The progress of science in furnishing the Government with means of espionage is not likely to stop with wire-tapping. Ways may some day be developed by which the Government, without removing papers from secret drawers, can reproduce them in court, and by which it will be enabled to expose to a jury the most intimate occurrences of the home. Advances in the psychic and related sciences may bring means of exploring unexpressed beliefs, thoughts and emotions." *Olmstead* v. *United States,* 277 U. S. 438, 471, 474. The circumstances of the present case show how the rapid advances of science are made available for that police intrusion into our private lives against which the Fourth Amendment of the Constitution was set on guard.

It is noteworthy that, although this Court deemed wiretapping not outlawed by the Constitution, Congress outlawed it legislatively by the Communications Act of 1934, 48 Stat. 1064, 1103, 47 U. S. C. § 605; *Nardone* v. *United States,* 302 U. S. 379; 308 U. S. 338. What is perhaps even more noteworthy is its pervasive disregard in practice by those who as law officers owe special obedience to law. What is true of the federal Act against wiretapping and its violations is widely true of related state legislation and its disobedience. See Westin, The Wire-Tapping Problem, 52 Col. L. Rev. 165 (1952). Few

sociological generalizations are more valid than that lawlessness begets lawlessness.

The members of this Court who so vigorously urged that wiretapping is within the clear scope of the prohibition of the Fourth Amendment were no sentimentalists about crime or criminals. Mr. Justice Holmes, Mr. Justice Brandeis, Mr. Justice Butler and Mr. Chief Justice Stone were no softies. In all matters of social policy we have to choose, and it was the hardy philosophy of life that his years in the Army of the Potomac taught him that led Mr. Justice Holmes to deem it "a less evil that some criminals should escape than that the Government should play an ignoble part." *Olmstead* v. *United States, supra,* at 470.

Suppose it be true that through "dirty business" it is easier for prosecutors and police to bring an occasional criminal to heel. It is most uncritical to assume that unless the Government is allowed to practice "dirty business" crime would become rampant or would go unpunished.

In the first place, the social phenomena of crime are imbedded in the texture of our society. Equally deep-seated are the causes of all that is sordid and ineffective in the administration of our criminal law. These are outcroppings, certainly in considerable part, of modern industrialism and of the prevalent standards of the community, related to the inadequacy in our day of early American methods and machinery for law enforcement and to the small pursuit of scientific inquiry into the causes and treatment of crime.

Of course we cannot wait on the slow progress of the sociological sciences in illuminating so much that is still dark. Nor should we relax for a moment vigorous enforcement of the criminal law until society, by its advanced civilized nature, will beget an atmosphere and environment in which crime will shrink to relative insig-

nificance. My deepest feeling against giving legal sanction to such "dirty business" as the record in this case discloses is that it makes for lazy and not alert law enforcement. It puts a premium on force and fraud, not on imagination and enterprise and professional training. The third degree, search without warrant, wiretapping and the like, were not tolerated in what was probably the most successful administration in our time of the busiest United States Attorney's office. This experience under Henry L. Stimson in the Southern District of New York, compared with happenings elsewhere, doubtless planted in me a deep conviction that these short-cuts in the detection and prosecution of crime are as self-defeating as they are immoral.

Sir James Fitzjames Stephen brings significant testimony on this point:

> "During the discussions which took place on the Indian Code of Criminal Procedure in 1872 some observations were made on the reasons which occasionally lead native police officers to apply torture to prisoners. An experienced civil officer observed, 'There is a great deal of laziness in it. It is far pleasanter to sit comfortably in the shade rubbing red pepper into a poor devil's eyes than to go about in the sun hunting up evidence.' This was a new view to me, but I have no doubt of its truth." 1 Stephen, A History of the Criminal Law of England (1883), 442, note. Compare §§ 25 and 26 of the Indian Evidence Act (1872).

And Fitzjames Stephen, who acted on this experience in drawing the Indian Evidence Act, was no softie, either before he became a judge or on the bench.

Accordingly I adhere to the views expressed in *Goldman* v. *United States,* 316 U. S. 129, 136, that the *Olmstead* case should be overruled for the reasons set forth

in the dissenting opinions in that case. These views have been strongly underlined by the steady increase of lawlessness on the part of law officers, even after Congress has forbidden what the dissenters in *Olmstead* found the Constitution to forbid.

Even on the basis of the prior decisions of this Court, however, I feel bound to dissent. The Court seems not content with calling a halt at the place it had reached on what I deem to be the wrong road. As my brother BURTON shows, the Court now pushes beyond the lines of legality heretofore drawn. Such encouragement to lazy, immoral conduct by the police does not bode well for effective law enforcement. Nor will crime be checked by such means.

MR. JUSTICE DOUGLAS, dissenting.

The Court held in *Olmstead* v. *United States,* 277 U. S. 438, over powerful dissents by Mr. Justice Holmes, Mr. Justice Brandeis, Mr. Justice Butler, and Chief Justice Stone that wire tapping by federal officials was not a violation of the Fourth and Fifth Amendments. Since that time the issue has been constantly stirred by those dissents and by an increasing use of wire tapping by the police. Fourteen years later in *Goldman* v. *United States,* 316 U. S. 129, the issue was again presented to the Court. I joined in an opinion of the Court written by Mr. Justice Roberts, which adhered to the *Olmstead* case, refusing to overrule it. Since that time various aspects of the problem have appeared again and again in the cases coming before us. I now more fully appreciate the vice of the practices spawned by *Olmstead* and *Goldman.* Reflection on them has brought new insight to me. I now feel that I was wrong in the *Goldman* case. Mr. Justice Brandeis in his dissent in *Olmstead* espoused the cause of privacy—the right to be let alone. What he wrote is an

historic statement of that point of view. I cannot improve on it.

"When the Fourth and Fifth Amendments were adopted, 'the form that evil had theretofore taken,' had been necessarily simple. Force and violence were then the only means known to man by which a Government could directly effect self-incrimination. It could compel the individual to testify—a compulsion effected, if need be, by torture. It could secure possession of his papers and other articles incident to his private life—a seizure effected, if need be, by breaking and entry. Protection against such invasion of 'the sanctities of a man's home and the privacies of life' was provided in the Fourth and Fifth Amendments by specific language. *Boyd* v. *United States,* 116 U. S. 616, 630. But 'time works changes, brings into existence new conditions and purposes.' Subtler and more far-reaching means of invading privacy have become available to the Government. Discovery and invention have made it possible for the Government, by means far more effective than stretching upon the rack, to obtain disclosure in court of what is whispered in the closet.

"Moreover, 'in the application of a constitution, our contemplation cannot be only of what has been but of what may be.' The progress of science in furnishing the Government with means of espionage is not likely to stop with wire-tapping. Ways may some day be developed by which the Government, without removing papers from secret drawers, can reproduce them in court, and by which it will be enabled to expose to a jury the most intimate occurrences of the home. Advances in the psychic and related sciences may bring means of exploring unexpressed beliefs, thoughts and emotions. 'That

places the liberty of every man in the hands of every petty officer' was said by James Otis of much lesser intrusions than these. To Lord Camden, a far slighter intrusion seemed 'subversive of all the comforts of society.' Can it be that the Constitution affords no protection against such invasions of individual security?

.    .    .    .    .

"The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men. To protect that right, every unjustifiable intrusion by the Government upon the privacy of the individual, whatever the means employed, must be deemed a violation of the Fourth Amendment. And the use, as evidence in a criminal proceeding, of facts ascertained by such intrusion must be deemed a violation of the Fifth.

.    .    .    .    .

"Experience should teach us to be most on our guard to protect liberty when the Government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding." 277 U. S., *supra,* at 473–474, 478–479.

That philosophy is applicable not only to a detecta-phone placed against the wall or a mechanical device designed to record the sounds from telephone wires but also to the "walky-talky" radio used in the present case. The nature of the instrument that science or engineering develops is not important. The controlling, the decisive factor is the invasion of privacy against the command of the Fourth and Fifth Amendments.

I would reverse this judgment. It is important to civil liberties that we pay more than lip service to the view that this manner of obtaining evidence against people is "dirty business" (see Mr. Justice Holmes, dissenting, *Olmstead* v. *United States, supra,* p. 470).

MR. JUSTICE BURTON, with whom MR. JUSTICE FRANK-FURTER concurs, dissenting.

I agree with the dissenting opinion below that what Lee overheard by means of a radio transmitter surreptitiously introduced and operating, without warrant or consent, *within* petitioner's premises, should not have been admitted in evidence. The Fourth Amendment's protection against unreasonable searches and seizures is not limited to the seizure of tangible things. It extends to intangibles, such as spoken words. In applying the exclusionary rule of *Weeks* v. *United States,* 232 U. S. 383, we are primarily concerned with where and how the evidence is seized rather than what the evidence is. Cf. *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385; *United States* v. *Jeffers,* 342 U. S. 48; *Nueslein* v. *District of Columbia,* 73 App. D. C. 85, 115 F. 2d 690.

It seems clear that if federal officers without warrant or permission enter a house, under conditions amounting to unreasonable search, and there conceal themselves, the conversations they thereby overhear are inadmissible in a federal criminal action. It is argued that, in the instant case, there was no illegal entry because petitioner

consented to Chin Poy's presence. This overlooks the fact that Chin Poy, without warrant and without petitioner's consent, took with him the concealed radio transmitter to which agent Lee's receiving set was tuned. For these purposes, that amounted to Chin Poy surreptitiously bringing Lee with him.

This Court has held generally that, in a federal criminal trial, a federal officer may testify to what he sees or hears take place within a house or room which he has no warrant or permission to enter, provided he sees or hears it outside of those premises. *Olmstead* v. *United States,* 277 U. S. 438. Cf. *Hester* v. *United States,* 265 U. S. 57. This holds true even where the officer supplements his hearing with a hearing aid, detectaphone or other device outside the premises. This merely enables him to hear more distinctly, where he is, what reaches him *there* from wherever it may come. He and his hearing aid pick up the sounds outside of, rather than within, the protected premises. *Goldman* v. *United States,* 316 U. S. 129.

In the instant case, Chin Poy, who was lawfully in petitioner's room, could have testified as to what he, himself, saw or heard there. Yet, if he had been there unlawfully or surreptitiously, without warrant or consent, under conditions amounting to an unreasonable search, he should not be permitted, in this proceeding, to testify even to that. Cf. *Gouled* v. *United States,* 255 U. S. 298; *Nueslein* v. *District of Columbia, supra.* Similarly, if Lee, under like conditions, without warrant and without authority, entered the room with Chin Poy and, while concealed, overheard petitioner's conversation with Chin Poy, Lee's testimony should be excluded. In substance, that is what took place here. Lee's overhearing of petitioner's statements was accomplished through Chin Poy's surreptitious introduction, within petitioner's laundry, of Lee's concealed radio transmitter which, without petition-

er's knowledge or consent, *there* picked up petitioner's conversation and transmitted it to Lee outside the premises. The presence of the transmitter, for this purpose, was the presence of Lee's ear. While this test draws a narrow line between what is admissible and what is not, it is a clearly ascertainable line. It is determined by where the "effects" are seized or, as here, where the words are picked up. In this case the words were picked up without warrant or consent *within* the constitutionally inviolate "house" of a person entitled to protection there against unreasonable searches and seizures of his person, house, papers and effects. It is inevitable that the line be narrow between, on the one hand, the constitutional right of a person to be free from unreasonable searches and seizures and, on the other, the need for the effective prosecution of crime. Drawing the line is a continuing process. The important thing is that the direction of the line that emerges from successive cases be clear.