JUSTICE RICE,
dissenting.
¶78 It would be a dubious service to the genuine liberties protected by the Fourth
Amendment to make them bedfellows with spurious liberties improvised by farfetched analogies which would liken eavesdropping on a conversation, with the connivance of one of the parties, to an unreasonable search or seizure. We find no violation of the Fourth Amendment here.
On Lee v. United States, 343 U.S. 747, 754, 72 S. Ct. 967, 972 (1952).
¶79 The Court today makes the precise error with regard to the Montana Constitution’s Declaration of Rights, which the United States Supreme Court warned against in deciding the same issue under the *450 Bill of Rights of the United States Constitution. The Court’s error springs from an incorrect analytical approach to the issue, resulting in an unnecessarily broad and sweeping decision not predicated on the specific facts of this case. Indeed, the inattentiveness to the facts leads the Court to overlook the critical point of the case, and the unfortunate result is the overruling of our long-standing precedent and the distortion of the right to privacy.
¶80 Today the Court overrules the state and federal precedent we have long followed and strongly re-endorsed, and upon which law enforcement in this state has relied for twenty years. The Court justifies its decision to overturn this precedent by characterizing our resolution in Solis as non-controlling and our decision in Brown as “merely parallelling] federal jurisprudence ... and fail[ing] to properly analyze the greater rights guaranteed by Montana’s Constitution.” Opinion, ¶ 22.1 disagree with this assessment.
¶81 First, while I agree that Solis is not “controlling precedent,” Opinion, ¶ 24, I submit that the fact-grounded reasoning of the plurality opinion in Solis is precisely the correct analysis to be employed, and that the Solis plurality reached the correct decision under that fact-based approach. However, the Court determines that because Solis is not “controlling,” it need not be considered at all. Opinion, ¶¶ 18, 24.
¶82 Second, the Court’s contention that our decision in Brown failed to properly analyze the greater rights guaranteed by the Montana Constitution, Opinion, ¶ 22, is clearly without merit. In Brown we recognized that “Montana’s Constitutional protections have an existence which is separate from the Federal Constitutional protections” and that it is necessary to “offer an independent analysis of the privacy and search and seizure provisions of the Montana Constitution.” Brown, 232 Mont, at 9-10, 755 P.2d at 1370. Accordingly, we lengthened the analysis in Brown beyond the Fourth Amendment, stating that “[t]he analysis... must go further because the framers of the Montana Constitution specifically provided an additional protection with the right to privacy provision.” Brown, 232 Mont, at 10, 755 P.2d at 1370. Thus, we did not, as the Court spins, ignore the heightened privacy protections of our Montana Constitution in Brown.
¶83 Critically, the Brown court concluded that, under the Montana Constitution, the facts demonstrated that the defendant’s claim to an expectation of privacy was not one society would deem reasonable, and that the government’s actions, which effectuated only “the recording *451 of [Brown’s] words,” were not excessively intrusive. Brown, 232 Mont, at 11, 755 P.2d at 1371. Under the facts of that case, the Court approved the warrantless consensual electronic monitoring of a face-to-face conversation regarding a drug deal. However, the Court today ignores our holding in Brown and overrules that case on the thin basis that Brown “merely paralleled federal jurisprudence on the subject....” Opinion, ¶ 22.
¶84 It is true that Brown relied upon the United State Supreme Court case of White, a case which offered a very practical and common sense approach to the same issue we face today, and we should be wary of abandoning the well established and practical White decision by overruling Brown merely because Brown followed federal jurisprudence. In White the High Court emphasized a twentieth century “doctrinal” Fourth Amendment analysis, explaining the absence of a privacy interest in a consensually recorded drug transaction with a stranger:
Concededly a police agent who conceals his police connections may write down for official use his conversations with a defendant and testify concerning them, without a warrant authorizing his encounters with the defendant and without otherwise violating the latter’s Fourth Amendment rights. Hoffa v. United States, 385 U.S., at 300-03. For constitutional purposes, no different result is required if the agent instead of immediately reporting and transcribing his conversations with defendant, either (1) simultaneously records them with electronic equipment which he is carrying on his person, Lopez v. United States, supra; (2) or carries radio equipment which simultaneously transmits the conversations either to recording equipment located elsewhere or to other agents monitoring the transmitting frequency. On Lee v. United States, supra. If the conduct and revelations of an asent overatins without electronic equipment do not invade the defendant’s constitutionally justifiable expectations of privacy, neither does a simultaneous recording of the same conversations made by the asent or by others from transmissions received from the asent to whom the defendant is talkins and whose trustworthiness the defendant necessarily risks.
White, 401 U.S. at 751, 91 S. Ct. at 1125-26 (emphasis added). The Brown court noted that, while White was a four justice plurality opinion, seventeen years had passed since the decision, the Supreme Court had since endorsed the holding in U.S. v. Caceres, 440 U.S. 741, 99 S. Ct. 1465 (1979), and it had since been applied in the federal *452 circuits. Brown, 232 Mont, at 8-9,755 P.2d at 1369-70. Thus, our Court adopted White’s strong, practical reasoning and we should not discard it now.
¶85 Moreover, the Court ignores the fact that Brown has been specifically and repeatedly reaffirmed by this Court. In fact, in Belgarde, when we again entertained an argument that warrantless consensual monitoring violated the Montana Constitution’s privacy provisions, we noted our decision in Brown, and then took the unusual step of holding-emphatically-that “[w]e refuse to reverse this rule.” Belgarde, 244 Mont, at 504, 798 P.2d at 542 (emphasis added). The Court’s departure from stare decisis here is demonstratively weak and unsupported. With one fell swoop, the Court today overturns a longstanding and strongly applied line of authority with little concern for the consequences.
¶86 Having overruled Brown and dismissed Solis entirely, the Court then flits to another analysis in order to “examine the issue before us anew, applying more current and consistent interpretations of Article II, Sections 10 and 11 of the Montana Constitution.” Opinion, ¶ 24. This “analysis” is one which wholly disregards the facts, generalizes the issue on appeal, and renders broad, sweeping conclusions under the guise of “more current and consistent interpretations” of the Montana Constitution. I submit that there could be nothing more “current and consistent” than the interpretation we have repeatedly applied for the past twenty years.
¶87 After setting forth briefly the facts in the background section of the Opinion, ¶¶ 4-8, the Court barely mentions them again diming the remainder of the Opinion. An explanation for this detachment from the particulars may be that the Court, from the beginning, appears to have been thinking about broader or different issues than those actually raised here, as evidenced by the questions the Court asked the State during oral argument:
Q. It’s the State’s contention that there’s no need for particularized suspicion or probable cause. In fact, as I understand it, the State doesn’t even believe that there is any necessity that the cops believe that a crime was, is, or is about to be committed. They can run somebody with a body wire into somebody’s home at the cop’s discretion.
A. Because there is no search as this Court held in Brown-
Q. Well, isn’t that true?
A. Well, I think, I think your-the question, with all respect, is phrased too broadly.
*453 Q. Well, why is it phrased too broadly? If, if this is completely discretionary with the cops, they can send someone with a body wire into someone’s home to gather evidence. They can send somebody into a person’s home just to snoop. They can send somebody into a home to gather information that might be used in a future prosecution or no prosecution at all. It’s completely discretionary with the police. Correct?
A. No.
State’s counsel was correct. These questions were indeed phrased too broadly, demanding answers from counsel for scenarios not at issue.
¶88 The facts of this case do not involve the exercise of “complete discretion” by police to wire someone “just to snoop” or “to gather information that might be used” or not used at all. The facts here do not involve situations where police did not have particularized suspicion and probable cause. Even before wiring the informants, police had probable cause to believe that both defendants had already committed the crime of criminal distribution of dangerous drugs. Authority to wire aside, the police could have arrested the defendants because they had already committed a crime.[1]
¶89 The facts are critical, and this case should be decided on its facts. As the Court recites, “whether a person has knowingly exposed something to the public and, consequently, surrendered his or her privacy protections [is determined] by looking at the particular facts of the case.” Opinion, ¶ 29. See State v. Dunn, 2007 MT 296, ¶ 13, 340 Mont. 31, ¶ 13,172 P.3d 110, ¶ 13 (explaining that when “ascertaining if a person has a legitimate expectation of privacy, we look to the circumstances ....”); Scheetz, 286 Mont, at 48, 950 P.2d at 726 (stating that we look to “various factors”); State v. Siegal, 281 Mont. 250, 273-74, 934 P.2d 176, 190 (1997) (detailing the extensive measures taken by the defendant to ensure his privacy).
¶90 Although the Court gives “lip service” to the necessity of analyzing the facts, it largely fails to do so. For example, paragraphs 30 and 37 contain the critical holdings that the Defendants held an expectation of privacy that society accepts as reasonable. However, the Court neglects to mention the central factual issue of this case: the *454 consensual electronic monitoring of a drug deal by police. Instead, and without considering the nature or purpose of the conversations, the Court issues the sweeping proposition that there is an expectation of privacy in “face-to-face conversations” held in “private settings.” Opinion, ¶ 30. This conclusion, disconnected from the facts, will even prohibit a participant in the conversation from testifying about what the Defendant said or did, unless a warrant is first obtained. Not even the Defendants are asking for such a broad holding-but that is a consequence of leaving the facts behind. The facts of this case should form the basis of the analysis for the critical legal question before us, and I thus turn to the facts, beginning with those related to the expectation of privacy and the reasonableness of that expectation.
¶91 This was a commercial transaction. In each of the two cases before us, the seller, for the purpose of making a financial profit, offered and then sold a product to a buyer. But for the seller’s financial motive, and the buyer’s assurance of payment, these parties would not have met at all. It was the business deal, and only the business deal, which brought them together. Goetz was selling methamphetamine-Hamper, marijuana.
¶92 As in the typical commercial transaction, the sellers here offered their product to members of the public-they intentionally exposed and sold their product to customers who were non-confidants. The length of each transaction is reflective of its impersonal and commercial nature as each lasted only moments — similar to other retail purchases. These meetings were not social occasions between friends or family. The exchange of product and cash was made and the parties immediately went their own way, because the only purpose of their meeting-the sale-was completed. Thus, in these transactions, the defendants first “knowingly exposed” their business by offering to sell and then exposed their product during the actual exchange to someone who was not a confidant to them. See Scheetz, 286 Mont, at 53, 950 P.2d at 726-27 (explaining that “[w]hat a person knowingly exposes to the public is not protected, but what an individual seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.” (internal quotations omitted)).
¶93 The place of the transaction is also a relevant fact, though not necessarily determinative. See Siegal, 281 Mont, at 260, 934 P.2d at 181 (stating that what a person knowingly exposes “even in his own home or office” is not considered private). Goetz invited Trusler, described by the District Court as a “mere visitor,” into his home on Main Street and there conducted the brief sales transaction. Hamper *455 met Ms. White first in a parking lot on Main Street, where he got into her car for the brief conversation and sale. For the second sale, the District Court found that White was likewise a “mere visitor” in Hamper’s home where the brief sales exchange occurred.
¶94 The Comb’s analysis wholly ignores the specifics of these circumstances and it is clear that the Court’s decision is significantly disconnected from the factual predicate. In fact, this disconnect leads the Comb to restate the issue on appeal in a generic form as: “whether society is willing to recognize an individual’s subjective expectation that a one-on-one conversation conducted in a private setting is not being surreptitiously electronically monitored and recorded.” Opinion, ¶ 31. Accordingly, the Court only considers whether there exists a reasonable expectation of privacy in “a personal conversation held in a private setting[.]” Opinion, ¶ 31. This statement, and others in the opinion, is so broad that it would apply as readily to governmental recording of a conversation among friends or relatives socially gathered around the living room, as to the facts of this case. Indeed, who would disagree that society reasonably expects the government to not record “conversations held in a private setting” such as the confines of one’s home during a family Thanksgiving dinner? I certainly would not disagree-but those are not the facts here. The expectation of privacy in a personal family dinner setting is far different than the expectation of privacy in a commercial transaction where a product is sold to a non-confidant in a brief encounter. Although remarkably different, the Court’s imprecise analysis treats them as if they are identical-as if the Court is powerless to distinguish between these very different factual scenarios.
¶95 The law, however, does make such distinctions. Commercial transactions made with the public are not the same as social conversations among friends in the living room. Criminal enterprises are not the same as family Thanksgiving dinners. We should recall what Chief Justice Earl Warren wrote about the sale of illegal drugs out of a home. He too realized that these were “commercial” transactions which alter the privacy expectation:
The fact that the undercover agent entered petitioner’s home does not compel a different conclusion. Without question, the home is accorded the full range of Fourth Amendment protections. See Amos v. United States, 255 U.S. 313 (1921); Harris v. United States, 331 U.S. 145, 151, n. 15 (1947). But when, as here, the home is converted into a commercial center to which outsiders are invited for purposes of transacting unlawful business, that *456 business is entitled to no greater sanctity than if it were carried on in a store, a garage, a car, or on the street. A government agent, in the same manner as a private person, may accept an invitation to do business and may enter upon the premises for the very purposes contemplated by the occupant.
Lewis v. United States, 385 U.S. 206, 211, 87 S. Ct. 424, 427 (1966) (emphasis added). Thus, it is not merely the place, but the circumstances and character of a meeting-i.e., all the facts-which are critical to the assessment of the expectation of privacy. We should not endow criminal enterprises with a blanket expectation of privacy just because they are conducted within a home or within a vehicle. Indeed, a jurist no less concerned about individual rights than Justice William Brennan was very clear about the privacy claims of those engaged in the activities of the defendants here:
The Fourth Amendment protects against governmental intrusion upon “the sanctity of a man’s home and the privacies of life.” Boyd v. United States, 116 U.S. 616, 630. However, the occupant can break the seal of sanctity and waive his right to privacy in the premises. Plainly he does this to the extent that he opens his home to the transaction of business and invites anyone willing to enter to come in to trade with him.
Lewis, 385 U.S. at 213, 87 S. Ct. at 428 (J. Brennan, concurring).
¶96 The public and commercial nature of the criminal enterprise at issue here-the sale of illegal drugs to strangers-separates this case from other kinds of crimes, even drug-related, and further illustrates the necessity of a close factual analysis. For instance, a person joining others at a friend’s house to smoke pot, though an illegal act, would have a different privacy expectation than a person who undertakes the risk of meeting with a member of the public to consummate a drug transaction. The dynamics of these situations are clearly different, and it is the different dynamics which instruct the analysis under the first two prongs of the unreasonable search and seizure test-(l) actual expectation of privacy and (2) society’s willingness to accept the expectation as objectively reasonable. A person simply cannot have the same expectation of privacy when he knowingly exposes illegal drugs for the commercial purpose of selling them to a non-confidant as he does while engaged in private socializing with friends and family. Indeed, as shown below, the Defendants here expressed as much.
¶97 Consistent with its approach of over-generalizing, the Court attempts to summarize the statements of the delegates to the 1972 Montana Constitutional Convention in a manner which appears to *457 provide support for its holding, and concludes that the Defendants had a reasonable expectation of privacy because “Montanans continue to cherish the privacy guaranteed them by Montana’s Constitution.” Opinion, ¶ 35.1 certainly do not dispute this general conclusion, and do not dispute the general idea that the delegates to the constitutional convention held privacy in high regard. However, the Court considers only some of the delegates words, and ignores other specifically applicable words altogether, thereby covering up the reality that the delegates’ primary concern was over electronic surveillance and eavesdropping undertaken by the government without the consent of any party, about which Delegate Campbell’s indication that such activity “was really not a need and such activity was not taking place at this time” can be understood, as well as the delegates’ actual expressions about the factual scenario at issue here. Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, p. 1682. Delegate Campbell further amplified:
I feel that with “oral communications” you are not excluding the legitimate law enforcement people, who, with the consent of one party, the person who is being threatened by phone calls and things like this, to act on behalf of the victim. The privacy of that individual certainly could be waived with his or her consent, and there’s certainly no privacy toward the obscene caller.
Transcript, p. 1685. And Delegate Dahood added:
Yes, let me answer that question. First of all, this does not in any way relate to the obscene phone call situation, nor does it relate to the ability of the telephone company to make traces. The logic and reason is this: all personal rights, constitutional or otherwise, may be waived. Lady A is receiving the obscene phone call. She waives her right and grants the telephone company the right to intercept that communication. The individual that’s making the call does not have the right of privacy with respect to violating the law and making the obscene phone calls, so as a consequence, we are not interfering with anyone’s rights ....
Transcript, p. 1686.
¶98 To be sure, the delegates, as quoted in Siegal, 281 Mont, at 276-77, 934 P.2d at 192, condemned “wiretaps,” “eavesdropping,” “electronic surveillance” and other forms of nonconsensual monitoring, yet at the same time spoke approvingly of a party consenting to the monitoring of a telephonic conversation wherein the other party had, under the facts, waived the right to privacy in the communication. The case before us illustrates a similar scenario-consent by one party and *458 facts illustrating no reasonable expectation of privacy on part of the other in the transaction. The delegates clearly distinguished between these two different scenarios, but the Court does not. Neither does the Court acknowledge the delegates’ specific views in this regard.
¶99 Consequently, the Court finds a privacy expectation in what the delegates clearly stated was a non-private situation. The Court does not explain how a privacy interest springs forth from a non-private commercial transaction. In paragraph 35, the Court appears to distinguish between the risk that a conversation will be repeated and the risk that the same conversation will be consensually electronically monitored by government agents. However, if this is the Court’s distinction, it is without a constitutional difference because society would not consider a privacy interest in a non-private commercial drug transaction to be reasonable. Indeed, our constitutional convention delegates did not, and neither did some of the greatest legal minds of our time, as quoted herein. Accordingly, I would join them and conclude that no “search” took place. See Hamilton, ¶ 17 (explaining that where no objectively reasonable expectation of privacy exists a search does not occur).
¶100 However, even assuming arguendo that a search did occur, the Court’s analysis of the “nature of the State’s intrusion” again further ignores the facts of the present case and mischaracterizes the role of consent in our search and seizure jurisprudence. Most notably, while the Court overrules Brown on the basis that it “merely paralleled federal jurisprudence,” in its discussion of “consent” the Court opts to “use some federal Fourth Amendment analysis in addressing issues under the Montana Constitution” and relies on the Supreme Court case of Georgia v. Randolph. Opinion, ¶ 42. The Court’s reliance on federal jurisprudence is inconsistent at best and an unfortunate consequence is the twisting of the holding in Randolph to fit the issue at hand.
¶101 Randolph involved the search of a home despite one of the co-occupant’s express refusal to consent to the search. The United States Supreme Court concluded that the refusal of one occupant to consent trumps the consent of a co-occupant and the police may not search the shared quarters. Randolph, 547 U.S. at 120, 126 S. Ct. at 1526. The Randolph situation cannot fairly be likened to the instant case. As the Court correctly deduces, the item searched here is the conversation. Opinion, ¶ 45. However, a conversation, unlike a home, is not a shared space. Once the conversation commences, it becomes the individual property of each participant. See Brown, 232 Mont at 10, 755 P.2d at *459 1370 (stating that “both participants [have] an equal interest in the conversation ....”). Neither participant can prevent the other (absent privilege) from sharing or repeating the conversation because each has full control over it. A conversation is not the same as a dwelling space and, accordingly, consent of both conversationalists is not required in order to monitor the conversation.
¶102 However, by concluding that both parties to an electronically monitored conversation must consent to the monitoring, the Court fails to acknowledge the true distinction at work here: that consensual monitoring is different than “eavesdropping”-the monitoring of a conversation by the government without the consent of any party. The failure to honor the informant’s consent lumps consensual monitoring with eavesdropping for all constitutional purposes, because the same requirements are imposed for either, even though they are, according to longstanding jurisprudence, clearly constitutionally distinct. In sum, the Court renders the party’s “consent” null, giving it no effect whatsoever. “[T]here is a substantial distinction between ‘[revelations] to the Government by a party to conversations with the defendant’ and eavesdropping on conversations without the knowledge or consent of either party to it.” United States v. Karo, 468 U.S. 705, 716 n.4, 104 S. Ct. 3296, 3304 n.4 (1984). (Bracket in original.) We explain this in Brown: “It is important to stress that this holding does not open the floodgates to create an Orwellian society and that the individual is not left without protections against inappropriate electronic eavesdropping.” Brown, 232 Mont, at 11, 755 P.2d at 1371.
¶103 The Court’s conclusion also ignores the High Court’s guidance that “[t]he constant element in assessing Fourth Amendment reasonableness in the consent cases ... is the great significance given to widely shared social expectations[.T Randolph, 547 US. at 111, 126 S. Ct. at 1521 (emphasis added). The widely shared social expectation, as this Court accepts in paragraph 35, is that each person assumes the risk that a participant to the conversation may turn around and repeat the conversation. More importantly, we share the social expectation that we assume a person is who he purports to be. See Brown, 232 Mont at 11, 755 P.2d at 1371 (explaining that “mistaken trust” is not a defense). However, the Court leaves these social expectations behind and forces the Randolph rationale onto a highly distinguishable situation.
¶104 Even assuming that the Randolph rationale is appropriately used here, the Court ignores two critical points of that decision: (1) neither defendant “refused” consent here, as in Randolph, and (2) the *460 Randolph Court expressly stated that the police need not “take affirmative steps to find a potentially objecting co-tenant before acting on the permission they [have] already received.” Randolph, 547 U.S. at 122, 126 S. Ct. at 1527. The Court today reads into Randolph the requirement that the police give each person present an “opportunity to object to the search.” Opinion, ¶ 45.[2] However, the Supreme Court expressly refused to require police to take this type of affirmative action, stating: “There is no ready reason to believe that efforts to invite a refusal would make a difference in many cases, whereas every co-tenant consent case would turn into a test about the adequacy of the police’s efforts to consult with a potential objector.”Randolph, 547 U.S. at 122, 126 S. Ct. at 1527-28. The Court conveniently ignores these portions of the Randolph decision-perhaps this is what the Court means by saying it will “use some federal Fourth Amendment analysis ....” Opinion, ¶ 42 (emphasis added).
¶105 Moreover, by likening the instant case to Randolph the Court ends its analysis of the nature of the state’s intrusion and fails to consider other pertinent details. First and foremost, the recording did not produce any evidence beyond what the informant herself could have relayed. This fact led the District Court to conclude that the government action here was “not excessively intrusive.” The facts clearly distinguish the monitoring here from the “sense enhancing” technologies of the type we addressed in Siegal, which we noted could be used to “surreptitiously monitor the heat signatures generated by activities conducted within the confines of [Montanans’] private homes and enclosed structures for the purpose of drawing inferences about the legality of such activities.” Siegal, 281 Mont, at 274, 934 P.2d at 190. No such capture of private, unexposed information about the defendants was accomplished here. Nothing was recorded that the defendants did not consciously state, and which the informants could not relate as having heard firsthand.
¶106 It could be argued that consensual monitoring enhances the senses of police because officers can hear a conversation which they otherwise could not. However, this distinction is not one of constitutional dimension, because it relates only to the mode by which the information is received, not the content of that information. Whether the informant testifies, or the officer testifies with the tape, *461 the evidentiary potential is the same. Thus, it is clear that defendants’ constitutional privacy claim really boils down to trial strategy: they do not want the daunting task of fighting against the pesky truthfulness of their very own, recorded words. However, as well explained by Justice Harlan, writing for the United States Supreme Court in Lopez, there is no constitutional right in the expectation that a defendant’s own words will not be surreptitiously recorded:
Stripped to its essentials, petitioner’s argument amounts to saying that he has a constitutional right to rely on possible flaws in the agent’s memory, or to challenge the agent’s credibility without being beset by corroborating evidence that is not susceptible of impeachment. For no other argument can justify excluding an accurate version of a conversation that the agent could testify to from memory. We think the risk that petitioner took in offering a bribe to Davis fairly included the risk that the offer would be accurately reproduced in court, whether by faultless memory or mechanical recording.
Lopez v. United States, 373 U.S. 427, 439, 83 S. Ct. 1381, 1388 (1963) (emphasis added).
¶107 It is true that Justice Harlan later parted ways with the United States Supreme Court on the issue of warrantless consensual monitoring in White. His dissent in White often serves as fodder for arguments criticizing the practice, and, indeed, this Court quoted it in State v. Brackman, 178 Mont. 105, 115, 582 P.2d 1216, 1221 (1978), overruled, Brown, 232 Mont, at 8, 755 P.2d at 1369. Given that citation, and further, that Justice Harlan’s concurrence in Katz, 389 U.S. at 361, 88 S. Ct. at 516, is generally regarded as the source of our Court’s privacy jurisprudence, his approach in White to the issue before us is worth noting. In his White dissent, Justice Harlan gave the following test or construct for analyzing this technological issue:
This question must, in my view, be answered by assessing the nature of a particular practice and the likely extent of its impact on the individual’s sense of security balanced against the utility of the conduct as a technique of law enforcement.
White, 401 U.S. at 786, 91 S. Ct. at 1143 (J. Harlan, dissenting).
¶108 Applying Justice Harlan’s construct to the facts of this case yields interesting results. First, the “nature of the particular practice,” as discussed above, is not intrusive, as the monitoring here captured nothing more than the informant could also testify about, thus reducing defendants’ privacy claim to nothing more than a wish to be tried without the jury hearing a recording of their own words. *462 Secondly, what is the “likely extent of its impact on the individual’s sense of security’? Of course, the “extent” of the impact is likewise reduced by the limited information obtained by the monitoring, but this question is more fully answered by other facts from the record, which are most illustrative. As Goetz stated while selling drugs to Trusler:
[T]he real deal is with this sh**, they are all over. The Feds are f***ing everywhere in this town. The DTF, the FBI, there’s reason to be supermltraJ***ing-freaked!
¶109 I would suggest that the “likely extent of the impact” of consensual monitoring upon the “sense of security” of people commercially marketing illegal drugs to the public in an environment of active law enforcement is, respectfully, very minimal. This activity is a highly risky venture, and, indeed, one engaging in it truly has good reason to be “freaked” because, consistent with Goetz’s knowledge of the risk, law enforcement is engaged. Thus, the likely extent of the impact of consensual monitoring upon the defendants’ “sense of security,” with or without a warrant, is not reasonably significant.
¶110 Lastly, Justice Harlan’s construct requires a balancing of these first two factors against the “utility of the conduct as a technique of law enforcement.” On this point, few would disagree that, as a technology, this tool is of great utility to law enforcement. In a case involving a wired informant, we acknowledged that “[t]he use of informants has long been recognized as an allowable tool of police investigation.” State v. Reavley, 2003 MT 298, ¶ 36, 318 Mont. 150, ¶ 36, 79 P.3d 270, ¶ 36. This point was further acknowledged in the Court’s questioning of State’s counsel during oral argument in this case:
Counsel: What I am suggesting is that the heightened standards of particularized suspicion that the government would be burdened with if particularized suspicion were imposed absent this Court finding a search would really jeopardize our ability to use informants effectively and would basically give people a license to engage in criminal businesses in their homes. That’s what I’m suggesting.
Justice: Counsel, let me ask a broader question. I think all of us have become accustomed to the notion of, through television and the movies and books about police conduct, police investigation,... the use of criminal informants, confidential informants and the use of body wires. But often times we see [in] those, that the defendants are bad guys, they’re mafia, theyre organized crime, *463 there’s murders involved. Do we really need to allow this technology to come into play, allow this intrusion, when we’re talking about a fifty dollar pot buy?
Counsel: Well, I can see where people would disagree about the government doing that, but the fact of the matter is that this involves the criminal sale of dangerous drugs that the people’s representatives have determined to be illegal. And I don’t think the Court should get into determining whether one interest is stronger, whether you’re dealing with Mr. Goetz involving methamphetamine or Mr. Hamper involving marijuana. [Emphasis added.]
fill Truly, it is a different world today, not only in terms of technological advances, but also in the expectation of the use of technology. I would submit, as the questioning italicized above likewise indicates, that our citizens, especially young people in today’s society who have been raised in the age of Law and Order and CSI, would think it unusual that a drug dealer would have a reasonable expectation that his conversations during a drug sale to a non-confidant were not being consensually monitored. The drug dealer may have a subjective expectation, but it is not an expectation that our society would deem reasonable.
¶112 Moreover, monitoring provides protection for the informant, who risks physical harm to work with police, and provides for accurate recording and preservation of the evidence of the transaction. Thus, for purposes of Justice Harlan’s construct, the utility of this technology is very high in the furtherance of the state’s compelling state interest in “enforcing] its criminal laws for the benefit and protection” of the citizens. State ex rel Zander v. Dist. Ct, 180 Mont. 548, 556, 591 P.2d 656, 660 (1979). The weighing of Justice Harlan’s factors therefore results in a conclusion that the utility of the “particular practice” here clearly outweighs the impact upon the defendant’s sense of security.

Conclusion

¶113 This case has little to do with Montanans continuing to “cherish the privacy” of their homes, Opinion, ¶ 35, and even less about “one-on-one conversation^] conducted in a private setting” Opinion, ¶ 31 (emphasis added), simply because, in view of the facts, the setting here should not be considered private. A proper focus on the facts reveals that the defendants were engaged in commercial transactions with non-confidants, and we have been careful to explain that our privacy holdings do not necessarily apply to conduct engaged in “for *464 commercial purposes.” Gryczan v. State, 283 Mont. 433, 455-56, 942 P.2d 112, 126 (1997).
¶114 Rather, this case is about avoiding the truth — the defendants’ raising of a privacy claim to keep the truth, that is, the recording of their own words, from the jury and thereby gaining a tactical advantage by escaping the strong evidence of their crimes. They want this result despite the fact they are informed of the active police involvement to the point of being “super ultra freaked out” about local police presence and nonetheless assumed the high risk of exposing their trade and their wares through multiple contacts with non-confidants. Their actions were not consistent with the desire for privacy. Indeed, I believe it is untenable for the Court to conclude that society would find reasonable the privacy claims against the consensual monitoring of such actions. The District Court rightly concluded that society would not find this connived claim reasonable. There is not only no indication that the Declaration of Rights was intended to be applied to such risky, non-private behavior, but the debates demonstrate just the opposite. The Court’s conclusion to the contrary results, in my view, to the cheapening of our “genuine liberties,” about which the United States Supreme Court clearly warned. On Lee, 343 U.S. at 754, 72 S. Ct. at 971. Our right of privacy has been hijacked by those engaging in activities which the right was clearly not meant to protect, and has thus been devalued-becoming the new refuge of meth dealers selling to the public by means they well knew risked law enforcement involvement. The delegates to the Constitutional Convention did not countenance such a distortion of the right they found “essential to the well-being of a free society.”
¶115 And I would not, either. I dissent.
¶116 In response to the concurrences by Justice Cotter and Justice Leaphart, I appreciate that Justice Cotter’s concurrence at least recognizes the commercial nature of the facts, something the Court’s opinion does not do. However, I must disagree with her suggestion, made also by Justice Leaphart’s concurrence, that the analysis herein “is intended to apply only to those transactions that are criminal in nature.” J. Cotter, concurrence ¶ 125. As indicated by the discussion in paragraph 96 herein, and the example therein-that those gathering to smoke pot together, though a criminal act, would nonetheless have a different expectation than those engaged in the actions in this case-the criminal nature of the transaction does not control the outcome. As the Court recognizes in paragraph 29, the law requires that the expectation of privacy be determined by “looking at the *465 particular facts of the case.” That is precisely what this dissent advocates, without regard to the legality of those facts. It bears repeating, however, as recognized by the esteemed jurists quoted herein, that factual considerations, such as opening one’s house for commercial transactions, inevitably impacts the privacy analysis. Neither Justice Cotter nor Justice Leaphart has any answer to the collective wisdom expressed by these jurists on these issues.
¶117 I also disagree with Justice Cotter’s statement that the analysis would “gut any expectation of privacy one might reasonably have in his commercial conversation[.]” J. Cotter, concurrence ¶ 125. Again, we should be careful about making broad statements disconnected from the facts and the law. In addition to the commercial nature of the transaction, there are many additional facts, varying in each case, which our law requires to be considered. For purposes of brevity, no doubt, Justice Cotter’s concurrence does not consider the additional facts about this transaction. However, the facts are critical under our law. For example, is the expectation of privacy in a commercial transaction which takes place at a crowded garage sale the same as one consummated in a closed office? Unless we are going to decide cases without regard to the “particular facts of the case,” these factual distinctions should matter. Indeed, the law requires that we determine whether a claimed expectation of privacy is one society believes to be reasonable. The only way we can do so is by considering how society views the facts of the matter. If we are properly applying the law to the facts, then some commercial transactions would be viewed by society as private, and others would not. Our duty is to decide one case at a time, based upon the particular facts.
¶118 Justice Leaphart’s concurrence advocates that agents of the state should not monitor any conversation without a warrant, “no matter what the setting,” even those conversations which occur “outside a private setting.” J. Leaphart, concurrence ¶ 57, 59. Under this approach, all conversations, wherever and however conducted, would be blanketed with a privacy right. Courts would no longer need to consider the “particular facts of the case.” This may be what the author desires, but is categorically not a principle of American law. No jurisprudential authority can be cited for it. Although the concurrence cites Justice Harlan’s dissent in White, Justice Harlan was clearly not advocating for the extreme position taken by the concurrence, asserted to be necessary for a “free society.” J. Leaphart, concurrence ¶ 58.
¶ 119 Such notions of a “free society” are not consistent with the free society established by the constitutional history of this country and *466 state. As explained herein, this dissent joins the position taken by the U.S. Supreme Court on electronic monitoring under the federal constitution. This Court likewise interpreted the Montana Constitution for the past twenty years and, more importantly, the delegates of the 1972 Montana Constitutional Convention took the position of this dissent. Further, and which should give the Court pause, the high courts of our sister states, consistent with federal authority, have repeatedly reached the conclusion advocated by this dissent when interpreting their state constitutions. See Hammond v. State, 354 So. 2d 280, 292-93 (Ala. Crim. App. 1977); Smithey v. State, 602 S.W.2d 676, 679 (Ark. 1980); People v. Phillips, 711 P.2d 423, 437 (Cal. 1985); People v. Velasquez, 641 P.2d 943, 949 (Colo. 1982); State v. Grullon, 562 A.2d 481, 489 (Conn. 1989); Morningstar v. State, 428 So. 2d 220, 221 n.l (Fla. 1982), cert, denied, 464 U.S. 821 (1983); Green v. State, 299 S.E.2d 544, 546 (Ga. 1983); State v. Lester, 649 P.2d 346, 350-51 (Haw. 1982); People v. Richardson, 328 N.E.2d 260, 264 (Ill. 1975); Lawhorn v. State, 452 N.E.2d 915,918 (Ind. 1983); Carrier v. Commw., 607 S.W.2d 115, 117 (Ky. App. 1980); State v. Reeves, 427 So. 2d 403, 410 (La. 1983); Lee v. State, 489 So. 2d 1382,1386 (Miss. 1986); People v. Collins, 475 N.W.2d 684, 698 (Mich. 1991); State v. Engleman, 653 S.W.2d 198,199 (Mo. 1983); State v. Kilgus, 519 A.2d231,240-41 (N.H. 1986); State v. Levan, 388 S.E.2d 429, 438 (N.C. 1990); State v. Geraldo, 429N.E.2d 141,145-46 (Ohio 1981); Commw. v. Blystone, 549 A.2d 81, 87-88 (Pa. 1988); State v. Ahmadjian, 438 A.2d 1070,1081-82 (R.I. 1981); Clariday v. State, 552 S.W.2d 759, 768-69 (Tenn. Crim. App. 1976); State v. Boone, 581 P.2d 571, 573-74 (Utah 1978); Blackburn v. State, 290 S.E.2d 22, 32 (W. Va. 1982). Still further, the American Bar Association Criminal Justice, Electronic Surveillance of Private Communications Standard 2-5.1(a), states as follows:
A law enforcement officer should be permitted to intercept the contents of a private communication with the consent of one of the parties to the communication without a court order, provided that the officer intercepts and uses the communication in the proper performance of the officer’s official duties.
¶120 These authorities and sources make clear that Justice Leaphart’s “free society” theory runs counter to our nation and state’s constitutional principles as enunciated in countless cases. Indeed, the concurrence’s theory is more akin to traditional anarchist thought than our constitutional history: “[Alnarchism is based upon the idea of the sovereign individual, the belief that individual conscience and the pursuit of self-interest should not be constrained by any public body or *467 collective authority.” Andrew Heywood, Key Concepts in Politics, 46, (MacMillan Press 2000). Though we all desire privacy, our system was not formed upon, nor has ever endorsed, an absolute privacy right premised upon the sovereign individual which would permit a limitless pursuit of self-interest. However good it may sound in theory, doing “whatever one wants” without government interference is not a free society. It is anarchy. Such thinking would not have allowed American free society to survive for over two hundred years. Under our constitutions, freedom means the right to pursue one’s own life within the confines of the solemn principles upon which the democracy was founded.
¶121 Upon the collective judgment of the U.S. Supreme Court, the delegates to the 1972 Montana Constitutional Convention, the justices of the Montana Supreme Court for the past twenty years, and the high courts of our sister states, I would affirm the District Court.

 Pursuant to § 45-9-101(1), MCA, a person commits the offense of criminal distribution of dangerous drugs by, inter alia, “offer[ing] to sell, barter, exchange, or give away any dangerous drug[.]” (Emphasis added.) The defendants violated this statute by arranging the sale transactions with the informants, who reported the “offer” to pobce prior to the monitoring. An arrest could have been made without any monitoring. Of course, the pobce wisely sought additional evidence to bolster their case.

 The very idea that one engaged in the commercial sale of illegal drugs to a non-confidant must be given the “opportunity to object” before police can monitor the parties’ conversation is a flight into the fanciful, perhaps the ludicrous.