JUSTICE NELSON,
specially concurring.
¶73 It’s time that we jettison the Katz test. Here’s why.
I. Introduction
¶74 I concur in the Court’s Opinion as to Issues 1 and 3. As to Issue 2, I agree with the Court that the warrantless recording of Allen and Golie’s telephone conversation violated Article II, Sections 10 and 11 of the Montana Constitution. However, I suggest that our decisions here and in State v. Goetz, 2008 MT 296, 345 Mont. 421, 191 P.3d 489, do not fully rectify the constitutional violation. In fact, our approach creates an anomaly in that the more reliable evidence of what Allen *521 said (the recording) is not admissible but the less reliable evidence (Golie’s testimony about what he said, based on her unaided memory) is admissible. Not only that, while we uphold Allen’s constitutional rights by suppressing the actual recording, we simultaneously undermine those rights by allowing Golie to testify (albeit, based on her unaided memory) as to the contents of the recording. This is akin to suppressing evidence obtained by means of an unlawful entry into the defendant’s home, but then allowing the officers to testify about that evidence and the fact that they found it in the defendant’s home. Granted, seeing physical evidence (such as the murder weapon or the baggie of marijuana) is often more compelling to the jurors than hearing a witness simply describe it. And this is even more true about verbal evidence: Hearing a recording played in court carries greater weight than hearing a witness testify about what was said, especially if the defense is able to undercut the witness’s credibility. But the point is that we not only suppress the murder weapon or the baggie of marijuana obtained pursuant to an unlawful search or seizure, we also disallow any testimony about it. See Murray v. United States, 487 U.S. 533, 536, 108 S. Ct. 2529, 2533 (1988); Wong Sun v. United States, 371 U.S. 471, 485, 83 S. Ct. 407, 416 (1963). Correspondingly, then, not only should the illegal recording of the defendant’s conversation be excluded, but so should any testimony about the contents of the recording. “Whether the informant testifies, or the officer testifies with the tape, the evidentiary potential is the same.” Goetz, ¶ 106 (Rice, J., dissenting). Hence, the constitutional violation is left only half rectified when we suppress only the tape.
¶75 I believe this is totally incongruous and devoid of any persuasive justification. As explained below, one of the rationales proffered in support of these inconsistent results is that surreptitiously recording or eavesdropping on a conversation is a more offensive and invasive evidence-gathering technique than acquiring the same evidence by means of a face-to-face stratagem, such as an agent who masquerades as the person’s confidant and then testifies as to what the person unwittingly said. In my view, however, the fact that one technique may seem more offensive or invasive than another is beside the point. Both techniques involve the extraction of evidence from the speaker, and both implicate the speaker’s right to be secure from unreasonable searches. Another proffered rationale is premised on supposed “risks” and “expectations’-specifically, that people risk or must expect that they may be deceived as to the identity of one with whom they speak, but do not risk or expect that their statements are being secretly *522 recorded or monitored. Again, however, I believe that theoretical risks or expectations are beside the point. In this regard, I have reconsidered and now disagree with the notion-which we adopted from Justice Harlan’s concurrence in Katz v. United States, 389 U.S. 347, 361, 88 S. Ct. 507, 516 (1967)-that a “search” is determined by whether a person’s expectation of privacy is one that society is prepared to recognize as “reasonable.” See e.g. State v. Bullock, 272 Mont. 361, 375, 901 P.2d 61, 70 (1995); State v. Cotterell, 2008 MT 409, ¶¶ 26-27, 347 Mont. 231, 198 P.3d 254. For one thing, when this “self-indulgent test”[1] is employed, the privacy expectations that society is prepared to recognize as reasonable ultimately turn out to be the privacy expectations that a majority of the members of this Court decide are reasonable. It is doubtful that we are qualified or equipped to make such proclamations, especially in the absence of a factual record telling us what society’s views and expectations are. Moreover, as applied in the present case, the “expectations” test leads to the illogical conclusion that a person’s conversation with an informant has been “searched” to the extent that the informant records the conversation but has not been “searched” to the extent that the informant simply commits the conversation to memory. At a more fundamental level, however, the underlying premise that a “search” is defined by “risks” or “expectations” is itself implausible, for reasons I explain below.
¶76 Accordingly, rather than engage in subjective line-drawing about which privacy expectations we think society is prepared to recognize as reasonable and which law enforcement techniques we feel are too repugnant or invasive, we should simply apply the constitutional language according to its plain meaning. It states that “[t]he people shall be secure in their persons, papers, homes and effects from unreasonable searches and seizures.” Mont. Const, art. II, § 11. A “search” is “an endeavor to find, ascertain, recover, or the like; . . . hence, pursuit with a view to finding, etc.” Webster’s New International Dictionary of the English Language 2257 (2d ed. 1934). And to “search” means “ ‘[t]o look over or through for the purpose of finding something; to explore; to examine by inspection.’ ” Kyllo v. United States, 533 U.S. 27, 32 n. 1, 121 S. Ct. 2038, 2042 n. 1 (2001) (quoting N. Webster, An American Dictionary of the English Language 66 (1828) (reprint 6th ed. 1989)). When the government engages in such activity, it is conducting a “search”; and when that search implicates an individual’s *523 person, papers, home, or effects, the government must first procure a warrant (absent an exception to the warrant requirement). If it fails to do so, then the evidence obtained, in whatever form, should be suppressed.
¶77 My analysis below is in two parts. First, I explain that using an agent to acquire a suspect’s verbalized thoughts by means of an in-person stratagem is a “search” requiring a warrant. Second, I explain that allowing an agent to provide testimony regarding illegally obtained (and, therefore, suppressed) evidence undermines the right against unreasonable searches and, thus, is contrary to the purposes of the exclusionary rule.
II. ‘Search”Analysis
¶78 Article II, Section 11 of the Montana Constitution and the Fourth Amendment to the United States Constitution both protect the right of the people to be secure in their persons, papers, homes, and effects from unreasonable searches and seizures. No one would dispute that when a police officer enters a person’s home and rummages through her belongings, it is a “search.” But what about when the police seek a person’s knowledge concerning illegal activities? So far, the government is not able to enter and rummage through a person’s mind for “guilty knowledge’-although that possibility may be on the horizon.[2] And while direct questioning sometimes yields such evidence, the fact is that it is often necessary to employ stratagem or secret monitoring in order to catch those engaged in criminal enterprises. See Lewis v. United States, 385 U.S. 206, 208-09, 87 S. Ct. 424, 426 (1966). The question then arises as to whether the government is conducting a “search” when it acquires verbal evidence through such techniques. Can verbal evidence be the subject of a search? Do people have a privacy interest in their communications? Is there a material distinction, for constitutional purposes, between memorizing what a suspect says and simultaneously recording what the suspect says?
¶79 The Supreme Court considered these issues in a series of cases decided in the 1950s, ’60s, and ’70s. Although my conclusions herein rest on independent state law grounds under the Montana Constitution, our jurisprudence on the subjects of electronic surveillance, privacy in communications, and what constitutes a “search” has borrowed concepts articulated by the Supreme Court in *524 those cases. See e.g. Opinion, ¶¶ 37, 40; Goetz, ¶ 22; Cotterell, ¶¶ 26-27. Notably, that Court’s decisions in this area proceed on a tortuous path and are difficult to reconcile. Nevertheless, they provide important context for my analysis. Thus, I begin with a discussion of six of the cases.

On Lee

¶80 First, in On Lee v. United States, 343 U.S. 747, 72 S. Ct. 967 (1952), the defendant (On Lee), who owned a laundry, was suspected of engaging in illegal narcotics traffic. Government agents enlisted the services of one Chin Poy, an old acquaintance and former employee of On Lee. Chin Poy was equipped with a small microphone and transmitting device which enabled one of the agents (Agent Lee), stationed outside, to monitor Chin Poy’s conversations with On Lee. Chin Poy, acting without a warrant, then engaged On Lee in a conversation at the laundry during which On Lee made incriminating statements which were overheard by Agent Lee. At trial, Chin Poy was not called to testify about On Lee’s admissions; rather, Agent Lee related the conversations as heard through his receiving set.
¶81 On appeal, the Supreme Court, by a five-justice majority, affirmed the admission of this evidence. The Court relied on the rule, articulated in Olmstead v. United States, 277 U.S. 438, 48 S. Ct. 564 (1928), that the Fourth Amendment is violated only where there has been (1) a search and seizure of the defendant’s person, (2) a seizure of his papers or his tangible material effects, or (3) an actual physical invasion of his house or curtilage for the purpose of making a seizure. Id. at 466, 48 S. Ct. at 568; see also Goldman v. United States, 316 U.S. 129, 134-35, 62 S. Ct. 993, 996 (1942). In other words, as applicable here, the Amendment is limited to the tangible fruits of actual trespasses. Based on this restrictive view of the constitutional language, the Court held that the conduct of Chin Poy and Agent Lee did not amount to an unlawful search and seizure because “no trespass was committed. Chin Poy entered a place of business with the consent, if not by the implied invitation, of [On Lee].” On Lee, 343 U.S. at 751-52, 72 S. Ct. at 971.
¶82 On Lee urged the Court to reconsider the question of Fourth Amendment rights in the field of overheard or intercepted conversations. But the Court responded that even if it overruled Olmstead and its progeny, On Lee’s challenge would still fail because he
was talking confidentially and indiscreetly with one he trusted, and he was overheard. This was due to aid from a transmitter and *525 receiver, to be sure, but with the same effect on his privacy as if agent Lee had been eavesdropping outside an open window. The use of bifocals, field glasses or the telescope to magnify the object of a witness’ vision is not a forbidden search or seizure, even if they focus without his knowledge or consent upon what one supposes to be private indiscretions. It would be a dubious service to the genuine liberties protected by the Fourth Amendment to make them bedfellows with spurious liberties improvised by farfetched analogies which would liken eavesdropping on a conversation, with the connivance of one of the parties, to an unreasonable search or seizure.
On Lee, 343 U.S. at 753-54,72 S. Ct. at 972 (emphasis added). Implicit in this reasoning is the principle, reflected in subsequent cases discussed below, that a person’s privacy interest is the same whether (a) the auditor (i.e., the person being spoken to) is wearing a transmitting device, (b) the auditor is secretly recording the conversation at the behest of the government, or (c) the auditor is committing the conversation to memory.

Silverman

¶83 Next, in Silverman v. United States, 365 U.S. 505, 81 S. Ct. 679 (1961), the police suspected that certain premises were being used for a gambling operation. They obtained permission to enter a vacant adjoining row house, and from there inserted a “spike mike” through the party wall until it made contact with a heating duct serving the defendants’ house, “thus converting their entire heating system into a conductor of sound.” Id. at 507, 81 S. Ct. at 680. The officers then listened to conversations taking place in the defendants’ house, about which the officers testified at trial.
¶84 The Supreme Court held that this violated the Fourth Amendment. Writing for the Court, Justice Stewart distinguished Olmstead, Goldman, and On Lee on the ground that those cases did not involve an “unauthorized physical penetration” into the defendants’ premises, whereas here the officers overheard the defendants’ conversations “only by usurping part of the [defendants’] house or office-a heating system which was an integral part of the premises occupied by the [defendants], a usurpation that was effected without their knowledge and without their consent.” Id. at 509, 511, 81 S. Ct. at 681, 682. Justice Stewart stated that “an actual intrusion into a constitutionally protected area” violates the Fourth Amendment “whether or not there was a technical trespass under the local property law relating to party walls.” Id. at 511, 512, 81 S. Ct. at 682, 683. He *526 thus implicitly rejected the trespass rationale underlying Olmstead, Goldman, and On Lee. Likewise, in finding a constitutional violation here, he implicitly held that the fruits of electronic surveillance, though intangible, are within the reach of the Fourth Amendment. This holding was reaffirmed two years later in Wong Sun v. United States, 371 U.S. 471, 485-86, 83 S. Ct. 407, 416 (1963).
¶85 Notably, Justice Stewart further observed that “[t]his Court has never held that a federal officer may without warrant and without consent physically entrench into a man’s office or home, there secretly observe or listen, and relate at the man’s subsequent criminal trial what was seen or heard.” Silverman, 365 U.S. at 511-12, 81 S. Ct. at 683. One would think that this rule should apply to all secret encroachments upon a person’s privacy for purposes of evidence gathering. In this regard, Justice Douglas concurred in the Court’s decision but found it incongruous that a listening device placed on the outside wall of a house or office is a permissible invasion of privacy (Goldman) while a listening device that penetrates the wall is not (Silverman). He argued-correctly, in my view-that the invasion of privacy occurs not because there is “an unauthorized physical penetration into the premises,” but because “the intimacies of the home [are] tapped, recorded, or revealed.” Id. at 512-13, 81 S. Ct. at 683 (Douglas, J., concurring).

Lopez

¶86 The next important decision is Lopez v. United States, 373 U.S. 427, 83 S. Ct. 1381 (1963). In that case, the defendant (Lopez) was charged with attempting to bribe an agent of the Internal Revenue Service (Agent Davis). The charges arose out of several conversations between Lopez and Agent Davis at Lopez’s business office. During a meeting on October 21,1961, Lopez offered Agent Davis money to drop his investigation into possible evasion of excise taxes. Agent Davis reported this to his superior and thereafter met with four Internal Revenue Inspectors, who instructed him to keep his appointment with Lopez on October 24, to pretend to play along with the scheme, and to draw the conversation back to the October 21 meeting. Agent Davis was equipped with a pocket wire recorder, which recorded his October 24 conversation with Lopez during which Lopez made incriminating statements. Agent Davis later testified about this conversation at trial, and the recording was also admitted into evidence.
¶87 On the question of whether Lopez’s Fourth Amendment rights were violated, Justice Harlan, writing for the majority, noted that the Supreme Court had sustained against constitutional challenge the *527 government’s use of electronic devices to eavesdrop on conversations, id. at 438, 83 S. Ct. at 1387-88 (citing Olmstead and Goldman), so long as the device was not “planted by an unlawful physical invasion of a constitutionally protected area,” id. at 438-39, 83 S. Ct. at 1388 (citing Silverman). Yet here, there had not even been any “eavesdropping,” since the government did not use an electronic device to listen in on conversations it could not otherwise have heard, but rather used the device “to obtain the most reliable evidence possible of a conversation in which the Government’s own agent was a participant and which that agent was fully entitled to disclose.” Id. at 439, 83 S. Ct. at 1388. Moreover, the device was not planted by means of an unlawful physical invasion of Lopez’s premises, but rather was carried in and out by an agent who was there with Lopez’s assent, and it neither saw nor heard more than the agent himself. Id. Thus, Justice Harlan wrote, Lopez’s claim was, in essence, that he had “a constitutional right to rely on possible flaws in the agent’s memory, or to challenge the agent’s credibility without being beset by corroborating evidence that is not susceptible of impeachment,” since “no other argument can justify excluding an accurate version of a conversation that the agent could testify to from memory.” Id. Justice Harlan rejected this claim, stating: “We think the risk that [Lopez] took in offering a bribe to Davis fairly included the risk that the offer would be accurately reproduced in court, whether by faultless memory or mechanical recording.” Id.
¶88 Justice Brennan wrote a vigorous dissent, in which Justices Douglas and Goldberg joined. First, regarding the government’s argument that Lopez surrendered his right of privacy when he communicated his “secret thoughts” to Davis, Justice Brennan observed:
The assumption, manifestly untenable, is that the Fourth Amendment is only designed to protect secrecy. If a person commits his secret thoughts to paper, that is no license for the police to seize the paper; if a person communicates his secret thoughts verbally to another, that is no license for the police to record the words. Silverman v. United States, 365 U.S. 505. On Lee certainly rested on no such theory of waiver. The right of privacy would mean little if it were limited to a person’s solitary thoughts, and so fostered secretiveness. It must embrace a concept of the liberty of one’s communications, and historically it has. “The common law secures to each individual the right of determining, ordinarily, to what extent his thoughts, sentiments, and emotions shall be communicated to others ... and even if he *528 has chosen to give them expression, he generally retains the power to fix the limits of the publicity which shall be given them.” Warren and Brandéis, The Right to Privacy, 4 Harv. L. Rev. 193, 198 (1890). (Emphasis supplied.)
Lopez, 373 U.S. at 449-50, 83 S. Ct. at 1393 (ellipsis in original).
¶89 Justice Brennan went on to discuss the distinct functions served by the two clauses of the Fourth Amendment, which state:
[1] The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and [2] no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
The second clause, he explained, was aimed specifically at the evil of the general warrant, often regarded as the single immediate cause of the American Revolution. Id. at 454, 83 S. Ct. at 1396. But of greater significance here, the first clause
embodies a more encompassing principle. It is... that government ought not to have the untrammeled right to extract evidence from people. Thus viewed, the Fourth Amendment is complementary to the Fifth. Feldman v. United States, 322 U.S. 487, 489-490. The informing principle of both Amendments is nothing less than a comprehensive right of personal liberty in the face of governmental intrusion.
Id. at 454-55, 83 S. Ct. at 1396. Justice Brennan noted that “a comprehensive right of privacy” under the Fourth and Fifth Amendments had been recognized and repeatedly approved in the Court’s decisions. See id. at 456-57, 83 S. Ct. at 1397.
¶90 Yet, despite these broad views regarding personal liberty, Justice Brennan did not dispute the majority’s conclusion that Agent Davis could testify about his conversations with Lopez. Thus, it seems that Justice Brennan’s objection had less to do with the fact that the government had extracted evidence from Lopez without a warrant and more to do with the nature of the evidence itself. Indeed, his position was that a secretly made recording of a person’s verbalized thoughts violates the Fourth Amendment, but the agent’s testimony from memory as to what the person said does not.
¶91 In support of this distinction, Justice Brennan asserted that there is “a qualitative difference between electronic surveillance, whether the agents conceal the devices on their persons or in walls or under beds, and conventional police stratagems such as eavesdropping and *529 disguise.” Id. at 465, 83 S. Ct. at 1402. He argued that “[t]he latter do not so seriously intrude upon the right of privacy” because “[t]he risk of being overheard by an eavesdropper or betrayed by an informer or deceived as to the identity of one with whom one deals is probably inherent in the conditions of human society. It is the kind of risk we necessarily assume whenever we speak.” Id. He suggested that this risk “is not an undue risk to ask persons to assume, for it does no more than compel them to use discretion in choosing their auditors, to make damaging disclosures only to persons whose character and motives may be trusted.” Id. at 450, 83 S. Ct. at 1393. However, electronic surveillance, he posited, imposes a risk of “a different order.” Id. Specifically, it is
the risk that third parties, whether mechanical auditors like the Minifon [as in Lopez] or human transcribers of mechanical transmissions as in On Lee-third parties who cannot be shut out of a conversation as conventional eavesdroppers can be, merely by a lowering of voices, or withdrawing to a private place-may give independent evidence [3] of any conversation.
Id. at 450, 83 S. Ct. at 1394. Justice Brennan argued that “[t]here is no security from that kind of eavesdropping, no way of mitigating the risk, and so not even a residuum of true privacy.” Id. at 466, 83 S. Ct. at 1402. He concluded that “[t]here is only one way to guard against such a risk, and that is to keep one’s mouth shut on all occasions.” Id. at 450, 83 S. Ct. at 1394.
¶92 I question Justice Brennan’s assumption that there is no way of mitigating the risk that third parties may give independent evidence of a conversation. The speaker could mitigate this risk by, for example, sweeping the immediate area for bugs and by checking his auditor for hidden microphones and recorders. In fact, taking such precautionary measures may be highly effective in mitigating the risk of mechanical eavesdropping and recording. In contrast, even when the speaker uses “discretion” in choosing an auditor whose character and motives seem trustworthy, such trust may turn out to be misplaced or later circumstances may compel the auditor to divulge the conversation. Bottom line: Steps may be taken to mitigate both risks identified by Justice Brennan-i. e., the risk that one’s statements will be divulged by *530 one’s auditor and the risk that one’s statements will be monitored, recorded, and divulged through electronic means. But regardless of how many steps are taken to ensure confidentiality, the fact remains that whenever we speak, there is a risk that our statements may be repeated. And the only way to guard against such risk, whether it is created by the possibility of an unreliable auditor or the possibility of a hidden electronic device, is simply not to speak-i.e., “to keep one’s mouth shut on all occasions.” Of course, as Justice Brennan points out earlier in his dissent, “[t]he right of privacy would mean little if it were limited to a person’s solitary thoughts, and so fostered secretiveness.” Lopez, 373 U.S. at 449-50, 83 S. Ct. at 1393. Indeed, what, then, will be the protection of Article II, Sections 10 and 11, when the government has the technology to surreptitiously read another’s thoughts? See ¶ 78 n. 2, supra.
¶93 Also problematic with this “risk” approach is the fact that what a person risks is ultimately determined by what the law allows. Thus, when the law allows warrantless participant monitoring or recording (as was the case until our decision in Goetz), the risk of such monitoring or recording becomes as “inherent in the conditions of human society” as the risk of being overheard by an eavesdropper, betrayed by an informer, or deceived as to the identity of one with whom one deals. Indeed, because Allen’s conversation with Golie occurred prior to our decision in Goetz, it could be said that he took the “risk” that this conversation would be recorded without a search warrant, given that our pre-Goefe caselaw allowed for that.
¶94 But regardless of these questionable facets of the “risk” approach, I do not find the question of risk to be pertinent, in any event, to the question posed by the constitutional language: Did the governmental action at issue constitute a “search” which intruded upon the defendant’s person, home, papers, or effects? Justice Brennan’s “risk” approach is premised on the notion that “the Fourth and Fifth Amendments interact to create a comprehensive right of privacy, of individual freedom, [which] has been repeatedly approved in the decisions of this Court.” Lopez, 373 U.S. at 456-57, 83 S. Ct. at 1397-98 (citing Boyd v. United States, 116 U.S. 616, 6 S. Ct. 524 (1886), and other cases). He thus frames the issue as one of “privacy,” rather than one of “search” and “security” in one’s person, home, papers, and effects. I do not believe the two are the same, however. For example, a person might create a site on the Internet advertising the sale of illicit drugs out of his home, and thus forfeit any claim of privacy in such activity; but this does not give the police carte blanche to barge *531 into his house without a warrant and conduct a search. More to the point, though, I do not believe that “privacy” and “search” should be treated the same under the Montana Constitution. While it might be argued that there is an implicit right of privacy under the Fourth and Fifth Amendments together, as well as a separate right against unreasonable searches under the Fourth Amendment alone, the reality is that both of these rights are set out separately in the Montana Constitution under Article II, Section 10 (privacy) and Section 11 (searches). Thus, it is error to treat them as creating just one single right of privacy. Section 10 ensures the right of individual privacy, but Section 11 ensures a substantively different right: the right to be secure in one’s person, papers, home, and effects from unreasonable searches.
¶95 While a “risk” approach (or, as discussed below, an “expectations” approach) may be useful for resolving questions of “privacy,” it is not, in my view, proper for resolving questions of “search.” As noted, a “search” is “an endeavor to find, ascertain, recover, or the like; . . . hence, pursuit with a view to finding, etc.” Webster’s New International Dictionary of the English Language 2257 (2d ed. 1934); see also e.g. State v. Arthun, 274 Mont. 82, 88, 906 P.2d 216, 220 (1995) (“ £A “search” is a prying into hidden places for that which is concealed.’ ” (quoting State v. Carlson, 198 Mont. 113, 118, 644 P.2d 498, 501 (1982))). And to “search” means “ £[t]o look over or through for the purpose of finding something; to explore; to examine by inspection.’ ” Kyllo v. United States, 533 U.S. 27, 32 n. 1, 121 S. Ct. 2038, 2042 n. 1 (2001) (quoting N. Webster, An American Dictionary of the English Language 66 (1828) (reprint 6th ed. 1989)). The “risk” test tells us nothing about whether the government is engaged in such activity. It shifts the focus from what the government is doing-looking for evidence-to what risks we think are okay to impose on society and what evidence-gathering techniques we think intrude “seriously” on the right of privacy. The constitutional language mandates, however, that whenever the government is “searching,” the individual in question has the right to be secure in her person, home, papers, and effects that the search will be reasonable-regardless of the risks she supposedly assumed and regardless of how seriously the particular evidence-gathering technique may intrude on her privacy.
¶96 For these reasons, I believe the proper focus is not on theoretical risks but, rather, is on whether the government is engaged in acquiring or extracting evidence and whether the defendant has knowingly chosen to expose his thoughts to the public or to someone *532 he knows to be a law enforcement agent. In Lopez, there is no question that Agent Davis was engaged in extracting evidence from Lopez. But Lopez knew full well that he was speaking with a government agent, and he knowingly chose to expose his thoughts (the attempted bribes) to that agent. A person who does so cannot be heard to complain that the evidence of those verbalized thoughts-whether in the form of the agent’s testimony or an electronic recording-was the product of an illegal search. On the other hand, an entirely different situation is presented where the auditor’s status as an agent of the government is kept hidden. There, the speaker does not make a knowing choice to waive his right against a warrantless search of his thoughts and communications. And I suggest that his security in his person is violated no less when the agent, masquerading as a confidant, commits the person’s verbalized thoughts to memory versus when the agent simultaneously records those thoughts.

Hoffa

¶97 Nonetheless, the Supreme Court again used the “risk” approach in Hoffa v. United States, 385 U.S. 293, 87 S. Ct. 408 (1966). That case involved an individual named Partin, who was an associate of James Hoffa. At the time (autumn 1962), Hoffa was on trial for violating the Taft-Hartley Act, and federal agents suspected that he might attempt to tamper with the jury in his trial. They accordingly enlisted Partin as a government informer, asking him to be on the lookout for such attempts and to report any wrongdoing he discovered. Ultimately, Hoffa made incriminating statements in Partin’s presence, and Partin’s reports and his subsequent testimony at Hoffa’s trial contributed to Hoffa’s conviction for endeavoring to bribe members of the jury in his 1962 trial.
¶98 On appeal, the Supreme Court rejected the contention that the government, through Partin, had conducted an illegal “search” for verbal evidence. Writing for the majority, Justice Stewart found it significant that Partin had not been a “surreptitious eavesdropper” but, rather, had been in Hoffa’s presence by invitation, and that every conversation Partin had heard was either directed to him or knowingly carried on in his presence. Hoffa, 385 U.S. at 302, 87 S. Ct. at 413. Hoffa, evidently, had simply relied on a “misplaced confidence” that Partin would not reveal his wrongdoing. Quoting Justice Brennan’s Lopez dissent, Justice Stewart observed that “ ‘[t]he risk of being overheard by an eavesdropper or betrayed by an informer or deceived as to the identity of one with whom one deals is probably inherent in the conditions of human society. It is the kind of risk we necessarily *533 assume whenever we speak.’ ” Id. at 302-03, 87 S. Ct. at 413-14.

Katz

¶99 In contrast, the Court held that the governmental eavesdropping at issue in Katz v. United States, 389 U.S. 347, 88 S. Ct. 507 (1967), did violate the defendant’s privacy in his conversations. In that case, FBI agents attached an electronic listening and recording device to the outside of the public telephone booth from which the defendant placed his calls. Evidence of the defendant’s end of his conversations was then used at trial to convict him of transmitting wagering information by telephone in violation of federal law. At the outset of his opinion for the Court, Justice Stewart addressed the parties’ focus on whether the telephone booth was a “constitutionally protected area”-a term the Court had used in Silverman. He rejected the premise that Fourth Amendment questions depend on whether a given “area,” viewed in the abstract, is “constitutionally protected.” He explained that “the Fourth Amendment protects people, not places.” Id. at 351, 88 S. Ct. at 511; see also Warden v. Hayden, 387 U.S. 294, 304, 87 S. Ct. 1642, 1648 (1967) (“[T]he principal object of the Fourth Amendment is the protection of privacy rather than property . . . .”). Thus, “[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.” Katz, 389 U.S. at 351, 88 S. Ct. at 511 (citations omitted). Here, for instance, while a telephone booth is generally accessible to the public, “[o]ne who occupies it, shuts the door behind him, and pays the toll that permits him to place a call is surely entitled to assume that the words he utters into the mouthpiece will not be broadcast to the world.” Id. at 352, 88 S. Ct. at 511-12. Thus, when the defendant entered the booth and sought to exclude “the ■uninvited ear” by shutting the door, he could expect that his words were private, particularly given “the vital role that the public telephone has come to play in private communication.” Id. at 352, 88 S. Ct. at 511, 512.
¶100 The government argued that no Fourth Amendment violation had occurred because the surveillance technique involved “no physical penetration” of the telephone booth. But Justice Stewart rejected this argument, explaining that because the Fourth Amendment extends to the recording of oral statements overheard without any technical trespass under local property law (citing Silverman), and because it protects “people,” and not simply “areas” against unreasonable searches and seizures, “it becomes clear that the reach of that *534 Amendment cannot turn upon the presence or absence of a physical intrusion into any given enclosure.” Id. at 353, 88 S. Ct. at 512. He thus concluded that “[t]he Government’s activities in electronically listening to and recording the [defendant’s] words violated the privacy upon which he justifiably relied while using the telephone booth and thus constituted a ‘search and seizure’ within the meaning of the Fourth Amendment.” Id.
¶101 This analysis is consistent with the “risk” approach employed in Lopez and Hoffa, although the Katz Court framed the inquiry as what one is justifiably entitled to “assume” under the circumstances. In fact, Justice Stewart’s analysis prompted Justice Harlan, concurring in the decision, to opine that a “search” occurs in the following situations:
My understanding of the rule that has emerged from prior decisions is that there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as “reasonable.” Thus a man’s home is, for most purposes, a place where he expects privacy, but objects, activities, or statements that he exposes to the “plain view” of outsiders are not “protected” because no intention to keep them to himself has been exhibited. On the other hand, conversations in the open would not be protected against being overheard, for the expectation of privacy under the circumstances would be unreasonable.
Id. at 361, 88 S. Ct. at 516 (Harlan, J., concurring). Here, he reasoned, a telephone booth is “a temporarily private place whose momentary occupants’ expectations of freedom from intrusion are recognized as reasonable.” Id. at 361, 88 S. Ct. at 516-17.
¶102 The Court’s holding in Nafe-that one who uses a closed telephone booth has a justifiable right of privacy and may assume that the words he utters into the mouthpiece “will not be broadcast to the world”-seems in tension with the holding of Hoffa, which stands for the contrary rule that the speaker must assume the risk that the words he utters into the mouthpiece will (or at least could) be broadcast to the world by the person at the other end of the line, who might be a government informer. Indeed, the FBI agents in Katz might have gathered the very same evidence by enlisting the recipient of the defendant’s calls to record them, which evidently (according to Hoffa and Lopez) would not have infringed the Fourth Amendment. Thus, if Hoffa is still good law after Katz, there must be a critical distinction *535 between the cases which allows the sort of warrantless evidence gathering conducted in Hoffa but disallows the sort of warrantless evidence gathering conducted in Katz.
¶103 The first apparent distinction is the particular means employed by the FBI agents in Katz: attaching a listening and recording device to the outside of the booth, rather than using a face-to-face ruse to obtain the defendant’s words. Yet, if a person in a closed telephone booth truly has a constitutionally protected right of privacy and is entitled to assume that the words she utters into the mouthpiece are private, then gathering those words invades her privacy regardless of how they are obtained.
¶104 A second distinction involves “risks” and “expectations.” According to the Court majorities in the above cases, a person risks that the person to whom she is speaking is a government agent who is recording (Lopez) or committing to memory (Hoffa) her statements. But a person does not expect that the government is secretly listening in on her conversations with someone who is not a government agent (Katz). This distinction is untenable because it rests on the absurd premise that a person’s expectation of privacy turns on a fact of which she is unaware-namely, whether the person to whom she is speaking is in fact a government agent. Moreover, as noted before, what a person risks or expects is ultimately determined by what the law allows. As Justice Harlan later acknowledged, “[o]ur expectations, and the risks we assume, are in large part reflections of laws that translate into rules the customs and values of the past and present.” United States v. White, 401 U.S. 745, 786, 91 S. Ct. 1122, 1143 (1971) (Harlan, J., dissenting). Justice Marshall made a similar point in Smith v. Maryland, 442 U.S. 735, 99 S. Ct. 2577 (1979):
More fundamentally, to make risk analysis dispositive in assessing the reasonableness of privacy expectations would allow the government to define the scope of Fourth Amendment protections. For example, law enforcement officials, simply by announcing their intent to monitor the content of random samples of first-class mail or private phone conversations, could put the public on notice of the risks they would thereafter assume in such communications.
Id. at 750, 99 S. Ct. at 2585 (Marshall & Brennan, JJ., dissenting). Likewise, if a court decides that the law allows warrantless participant recording of telephone calls, then the risk/expectation of being recorded becomes a risk/expectation that we assume whenever we speak. I disagree with the premise that the constitutional protections *536 were intended to be left to the whims of judges who may think that one privacy expectation is objectively reasonable and another is not. Cf. Minnesota v. Carter, 525 U.S. 83, 97, 119 S. Ct. 469, 477 (1998) (Scalia & Thomas, JJ., concurring) (“In my view, the only thing the past three decades have established about the Katz test (which has come to mean the test enunciated by Justice Harlan’s separate concurrence in Katz) is that, unsurprisingly, those ‘actual (subjective) expectations of privacy’ ‘that society is prepared to recognize as “reasonable,” ’ bear an uncanny resemblance to those expectations of privacy that this Court considers reasonable.” (citations omitted)).
¶105 Lastly, it could be argued that the cases are distinguishable in that the government (through its agent) was a party to the conversations in Hoffa but was a third-party intruder on the conversation in Katz. However, neither Hoffa nor the defendant in Katz knew whether the persons to whom they were speaking were in fact government agents; and, as noted, it is implausible that an individual’s expectation of privacy would turn on a fact of which she is unaware. It is also untenable that the government could nullify a person’s right of privacy in her communications through the mere expedient of deceiving the person as to the auditor’s police connections. The waiver of a constitutional right must be made knowingly and voluntarily. State v. McCarthy, 2004 MT 312, ¶ 32, 324 Mont. 1, 101 P.3d 288. Likewise, consent to a warrantless search must be given knowingly and voluntarily. State v. Bieber, 2007 MT 262, ¶ 29, 339 Mont. 309, 170 P.3d 444. To be voluntary, the waiver or consent must be “the product of a free and deliberate choice rather than intimidation, coercion, or deception.” Moran v. Burbine, 475 U.S. 412, 421, 106 S. Ct. 1135, 1141 (1986) (emphasis added). Accordingly, a person does not voluntarily waive her right of privacy in her communications or consent to a warrantless search where the government uses deception to gain access to those communications. Bottom line: Whether the government uses pretense to acquire statements made directly to an agent masquerading as a confidant, or whether the government secretly listens in on statements the person makes to a nongovernmental party, her privacy is invaded without her knowledge or consent. As noted, an invasion of privacy is effected where the intimacies of the person are tapped, recorded, extracted, or revealed-whether that involves in-person deception {Hoffa) or stealth tactics {Katz). But more to the point of this concurrence, both techniques are used to extract evidence from the person and, thus, constitute “searching.” Indeed, that the government is looking for *537 evidence is reflected by the fact that it is using artifice or surreptitious methods to gain access to what it seeks.

White

¶106 The last case in this discussion is United States v. White, 401 U.S. 745, 91 S. Ct. 1122 (1971). The issue there was whether the Fourth Amendment barred the testimony of government agents about conversations which had occurred between the defendant and a government informant (Jackson) and which the agents had overheard by means of a radio transmitter carried by Jackson and concealed on his person. On four occasions, the conversations took place in Jackson’s home, and each of these conversations was overheard by an agent outside using a radio receiver. Four other conversations-one in the defendant’s home, one in a restaurant, and two in Jackson’s car-were overheard by the use of radio equipment. The prosecution was unable to locate and produce Jackson at trial, and the trial court overruled objections to the agents’ testimony.
¶107 On appeal, a plurality of four (Justice White, joined by Chief Justice Burger and Justices Stewart and Blackmun) concluded that the electronic surveillance did not violate the Fourth Amendment because it did not invade a constitutionally justifiable expectation of privacy. More specifically, the plurality concluded that an individual does not have a constitutionally justifiable expectation that the person to whom she is speaking is not recording or transmitting the conversation to government agents. This conclusion was premised not on a plain-language interpretation of the Fourth Amendment, but rather on the privacy expectations that the Supreme Court itself had created during the preceding two decades through its decisions in On Lee, Lopez, Hoffa, and Lewis v. United States, 385 U.S. 206, 87 S. Ct. 424 (1966). I have already discussed the first three of these decisions. As for Lewis, a federal narcotics agent, by misrepresenting his identity and stating his willingness to purchase narcotics, was invited into the defendant’s home where an unlawful narcotics transaction was consummated. Thereafter, the narcotics were introduced at the defendant’s criminal trial over his objection. The Supreme Court held that this did not violate the Fourth Amendment, explaining that when,
as here, the home is converted into a commercial center to which outsiders are invited for purposes of transacting unlawful business, that business is entitled to no greater sanctity than if it were carried on in a store, a garage, a car, or on the street. A government agent, in the same manner as a private person, may accept an invitation to do business and may enter upon the *538 premises for the very purposes contemplated by the occupant.
Lewis, 385 U.S. at 211, 87 S. Ct. at 427.
¶108 Based on these decisions, Justice White (speaking for the White plurality) pointed out that regardless of “what the privacy expectations of particular defendants in particular situations may be or the extent to which they may in fact have relied on the discretion of their companions,” the fact remains that, “[s]o far, the law permits the frustration of actual expectations of privacy by ... authorizing the use of informants in the manner exemplified by Hoffa and Lewis.” White, 401 U.S. at 752, 91 S. Ct. at 1126. Indeed, the starting premise of Justice White’s analysis was this: “Concededly a police agent who conceals his police connections may write down for official use his conversations with a defendant and testify concerning them, without a warrant authorizing his encounters with the defendant and without otherwise violating the latter’s Fourth Amendment rights.” Id. at 751, 91 S. Ct. at 1125-26 (citing Hoffa). He then reasoned that
[i]f the conduct and revelations of an agent operating without electronic equipment do not invade the defendant’s constitutionally justifiable expectations of privacy [Hoffa], neither does a simultaneous recording of the same conversations made by the agent [Lopez] or by others from transmissions received from the agent to whom the defendant is talking and whose trustworthiness the defendant necessarily risks [On Lee and White].
... If the law gives no protection to the wrongdoer whose trusted accomplice is ... a police agent [Hoffa], neither should it protect him when that same agent has recorded [Lopez] or transmitted [On Lee and White] the conversations which are later offered in evidence to prove the State’s case.
Id. at 751-52, 91 S. Ct. at 1126.
¶109 Justice White thus implicitly disagreed with Justice Brennan’s contention in his Lopez dissent that there are constitutionally significant distinctions between electronic surveillance and conventional police stratagems. Indeed, Justice White argued that a person, in deciding whether to speak to a companion, would not distinguish between a possible government informer on the one hand and a possible government informer with a recorder or transmitter on the other. In fact, it is doubtful that Allen would have drawn such a distinction in the present case in deciding whether to speak to Golie.
Given the possibility or probability that one of his colleagues is cooperating with the police, it is only speculation to assert that *539 the defendant’s utterances would be substantially different or his sense of security any less if he also thought it possible that the suspected colleague is wired for sound. At least there is no persuasive evidence that the difference in this respect between the electronically equipped and the unequipped agent is substantial enough to require discrete constitutional recognition
Id. at 752, 91 S. Ct. at 1126.
¶110 Finally, Justice White noted that an electronic recording “will many times produce a more reliable rendition of what a defendant has said than will the unaided memory of a police agent.” Id. at 753, 91 S. Ct. at 1126. And, similar to Justice Harlan’s reasoning in Lopez, he rejected the notion “that a defendant who has no constitutional right to exclude the informer’s unaided testimony nevertheless has a Fourth Amendment privilege against a more accurate version of the events in question.” Id. at 753, 91 S. Ct. at 1126-27. Thus, for the foregoing reasons, Justice White concluded that it is “untenable to consider the activities and reports of the police agent himself, though acting without a warrant, to be a ‘reasonable’ investigative effort and lawful under the Fourth Amendment but to view the same agent with a recorder or transmitter as conducting an ‘unreasonable’ and unconstitutional search and seizure.” Id. at 753, 91 S. Ct. at 1127.
¶111 While there is logic in this reasoning, it must be kept in mind that Justice White’s conclusion was based on the plurality’s subjective view of “what expectations of privacy are constitutionally ‘justifiable,’ ” id. at 752, 91 S. Ct. at 1126 (citing Nate), which in turn was based on what the Court had said was permissible in its prior decisions in On Lee, Lopez, Hoffa, and Leicis-particularly the holdings in On Lee and Hoffa that the police may extract verbal evidence from people by means of in-person stratagems without a warrant. Thus, in order to reach the same conclusion as the plurality, one must accept the propositions that (1) whether a “search” has occurred depends on whether the defendant had an expectation of privacy that was constitutionally justifiable; (2) the police may, without a warrant, surreptitiously seek out verbal evidence from a person by means of an informant or undercover agent who is not equipped with electronic equipment but who instead remembers and testifies as to what was said; (3) there is no constitutionally material difference where that same agent is equipped with electronic equipment that simultaneously records or transmits the conversation; and (4) hence, any expectation an individual has that the person to whom she is speaking will not *540 repeat, record, or transmit her conversation at the government’s behest is not constitutionally justifiable.
¶112 Regardless of the validity of the second, third, and fourth of these propositions (and I do not concede their validity), I cannot agree with the first. “The Katz test-whether the individual has an expectation of privacy that society is prepared to recognize as reasonable-has often been criticized as circular, and hence subjective and unpredictable.” Kyllo v. United States, 533 U.S. 27, 34, 121 S. Ct. 2038, 2043 (2001) (citing critics). But even more problematic, I believe the test conflates the question of “privacy” with the question of “search.” As noted, these are two separate rights (see ¶ 94, supra); and it is implausible that the question of whether there has been a “search” turns not on what the government was doing, but rather on what the subject of that search expected with respect to her right of “privacy” (more specifically, whether her privacy expectation was constitutionally justifiable or one that society, presumably, is prepared to recognize as reasonable). Again, a “search” is “an endeavor to find, ascertain, recover, or the like;... hence, pursuit with a view to finding, etc.” Webster’s New International Dictionary of the English Language 2257 (2d ed. 1934); see also e.g. Arthun, 274 Mont. at 88, 906 P.2d at 220 (a “search” is “ ‘a prying into hidden places for that which is concealed’ ”). And to “search” means “ ‘[t]o look over or through for the purpose of finding something; to explore; to examine by inspection.’ ” Kyllo, 533 U.S. at 32 n. 1, 121 S. Ct. at 2042 n. 1 (quoting N. Webster, An American Dictionary of the English Language 66 (1828) (reprint 6th ed. 1989)). When the government engages in such activity, it is conducting a “search’-irrespective of whether we may think that society is prepared to recognize the person’s expectation of privacy as reasonable.
¶113 Notably, in the course of his analysis, Justice White distinguished the outcome in Katz on the ground that “Katz involved no revelation to the Government by a party to conversations with the defendant.” White, 401 U.S. at 749, 91 S. Ct. at 1124-25. The apparent meaning of this statement, as Justice White later explained in his opinion for the Court in United States v. Karo, 468 U.S. 705, 716 n. 4, 104 S. Ct. 3296, 3304 n. 4 (1984), is that there is no search when the government’s agent or informant consents to having the conversation with the suspect monitored (On Lee and White) but there is a search when neither party consents (Katz). I find this reasoning untenable. For one thing, as noted above (see ¶ 105, supra), it is absurd that the government can “consent” to its own monitoring of a conversation and *541 thereby vitiate the speaker’s right of privacy and nullify the warrant requirement. This approach, moreover, cannot be sustained under Katz’s expectations test. “Expectations are formed on the basis of objective appearances, not on the basis of facts known only to others.... [A person’s] expectation of privacy is either inherently reasonable or it is inherently unreasonable. [The auditor’s] undisclosed status as a government informant cannot alter the reasonableness of that expectation.” Karo, 468 U.S. at 724, 104 S. Ct. at 3308 (O’Connor & Rehnquist, JJ., concurring in part and concurring in the judgment).
¶114 Justice Black concurred in the judgment in White on the ground that the Fourth Amendment does not apply to eavesdropping. White, 401 U.S. at 754, 91 S. Ct. at 1127 (citing his dissent in Katz). Justice Brennan concurred in the result on the ground that Katz did not apply retroactively to the electronic surveillance at issue. Id. at 755, 91 S. Ct. at 1127. And Justices Douglas, Harlan, and Marshall dissented. Id. at 756-96, 91 S. Ct. at 1128-48. Of relevance to this discussion is Justice Harlan’s dissent.
¶115 Justice Harlan disputed the plurality’s contention that if A can relay verbally what is revealed to him by B (as in Lewis and Hoff a), or record and later divulge it (as in Lopez), then A can contemporaneously transmit to it another. Justice Harlan argued that “it is one thing to subject the average citizen to the risk that participants in a conversation with him will subsequently divulge its contents to another, but quite a different matter to foist upon him the risk that unknown third parties may be simultaneously listening in.” Id. at 777, 91 S. Ct. at 1138. He explained this view as follows:
The impact of the practice of third-party bugging, must, I think, be considered such as to undermine that confidence and sense of security in dealing with one another that is characteristic of individual relationships between citizens in a free society. It goes beyond the impact on privacy occasioned by the ordinary type of “informer” investigation upheld in Lewis and Hoff a. The argument of the plurality opinion, to the effect that it is irrelevant whether secrets are revealed by the mere tattletale or the transistor, ignores the differences occasioned by third-party monitoring and recording which insures full and accurate disclosure of all that is said, free of the possibility of error and oversight that inheres in human reporting.
Authority is hardly required to support the proposition that words would be measured a good deal more carefully and communication inhibited if one suspected his conversations were *542 being transmitted and transcribed. Were third-party bugging a prevalent practice, it might well smother that spontaneity-reflected in frivolous, impetuous, sacrilegious, and defiant discourse-that liberates daily life. Much off-hand exchange is easily forgotten and one may count on the obscurity of his remarks, protected by the very fact of a limited audience, and the likelihood that the listener will either overlook or forget what is said, as well as the listener’s inability to reformulate a conversation without having to contend with a documented record. All these values are sacrificed by a rule of law that permits official monitoring of private discourse limited only by the need to locate a willing assistant.
Id. at 787-89, 91 S. Ct. at 1143-44 (footnotes omitted).
¶116 Yet, while it may be true, for the reasons stated by Justice Harlan, that third-party bugging has a unique effect on privacy and security (as compared to “the ordinary type of‘informer’ investigation upheld in Lewis and Hoffa”) and, thus, poses a different “risk” to the average citizen, I do not believe such considerations are pertinent to the question of whether a “search” has occurred. Just because one evidence-gathering technique has the potential to create a greater chilling effect on speech than another does not mean that the former constitutes looking for evidence and the latter does not-unless we are to determine the “search” question based on the utility and desirability of a particular law enforcement practice.
¶117 That, in fact, is what Justice Harlan proposed. He acknowledged that the risk approach of Lewis, Lopez, and On Lee and the expectations approach of Katz “have their limitations and can, ultimately, lead to the substitution of words for analysis.” White, 401 U.S. at 786, 91 S. Ct. at 1143. He suggested, therefore, that judges should not “recite the expectations and risks without examining the desirability of saddling them upon society.” Id. The “critical question,” he proposed, is this:
whether under our system of government, as reflected in the Constitution, we should impose on our citizens the risks of the electronic listener or observer without at least the protection of a warrant requirement. This question must, in my view, be answered by assessing the nature of a particular practice and the likely extent of its impact on the individual’s sense of security balanced against the utility of the conduct as a technique of law enforcement.
Id. (paragraph break omitted). For the reasons quoted above, Justice *543 Harlan concluded that we should not impose on our citizens the risks of third-party electronic monitoring. See id. at 790, 91 S. Ct. at 1145.
¶118 I disagree with this approach for a number of reasons, not the least of which is that it is even more arbitrary and subjective than the original formulation of the Katz test. It is a dubious assumption in the first place that courts are qualified to divine whether society is prepared to recognize a particular expectation of privacy as reasonable. But it is even more doubtful that courts should be judging the “utility” of a particular police practice and deciding whether the likely extent of its impact on the individual’s sense of security is enough to justify requiring a warrant. Most importantly, however, as noted above, whether the police are looking for evidence is not answered by whether we should impose a particular “risk” on our citizens. Again, a “search” is a pursuit with a view to finding something, and to “search” means to look over or through for the purpose of finding something. “Risks” and “expectations” simply are not part of the equation.
Montana Law
¶119 Turning now to Montana law, our caselaw on the issue of warrantless electronic monitoring and recording with the consent of the informant or agent (i.e., warrantless participant monitoring/recording) is summarized in ¶¶ 15-22 of State v. Goetz, 2008 MT 296, 345 Mont. 421, 191 P.3d 489, and ¶¶ 36-43 of today’s Opinion. I am not going to review all of those cases in detail here, but will briefly discuss State v. Brackman, 178 Mont. 105, 582 P.2d 1216 (1978), and Goetz.
¶120 In Brackman, we followed the approach suggested by Justice Harlan in his White dissent and, thus, “weighted] what effect a decision favorable to the defendant would have on law enforcement abilities against this intrusion of privacy and what consequent effect that may have on freedom of speech.’’Brackman, 178 Mont. at 115, 582 P.2d at 1221. Doing so, a majority of the Court decided that monitoring or recording a conversation, even with the informant’s consent, requires a warrant. Notably, the majority evidently agreed with Justice Harlan’s view that electronically monitoring a conversation is a greater invasion of privacy than merely using an unwired informant. See id. (noting the defendant’s assertion that to allow warrantless participant monitoring would have a “chilling” effect on citizen discourse); Opinion, ¶ 37.
¶121 Our subsequent cases strayed from the analysis used in Brackman and aligned themselves instead with the views of the White plurality. See e.g. State v. Coleman, 189 Mont. 492, 616 P.2d 1090 *544 (1980); State v. Brown, 232 Mont. 1, 755 P.2d 1364 (1988); see also Goetz, ¶ 22. In Goetz, however, we examined the issue anew and decided that warrantless electronic monitoring and recording of a defendant’s conversation with an informant violates Article II, Sections 10 and 11 of the Montana Constitution, despite the informant’s consent to the monitoring. We framed our analysis in terms of the Katz test and asked (1) whether the defendants had actual subjective expectations of privacy and, if so, (2) whether society was willing to recognize the defendants’ expectations of privacy as reasonable. Goetz, ¶¶ 25-37. Under the first prong, we concluded that the defendants did have actual subjective expectations of privacy in their conversations. Goetz, ¶ 30. And under the second prong, we concluded that society was willing to recognize these expectations as reasonable. Goetz, ¶ 37. More specifically, we asserted that Montanans “are willing to risk that a person with whom they are conversing in their home or other private setting may repeat that conversation to a third person” but “are unwilling to accept as reasonable that the same conversation is being electronically monitored and recorded by government agents without their knowledge.” Goetz, ¶ 35. We cited no authority for the first half of this assertion; but with respect to the second, we relied on statements made by various delegates to the 1972 Montana Constitutional Convention regarding the government’s use of electronic surveillance. Goetz, ¶¶ 33-35. In today’s decision, the Court likewise relies on the delegates’ comments, as well as the views expressed by Justices Douglas and Harlan in White that to allow electronic monitoring and recording of conversations would kill free discourse and undermine people’s confidence and sense of security in dealing with one another. Opinion, ¶¶ 54-57.
‘Search” Redefined
¶122 I signed our Goetz decision and agree with much of the Court’s analysis under Issue 2 of today’s decision because I believe they both correctly apply the law as it presently stands. However, for the reasons set forth above and reiterated below, I believe that the present law-in particular, the Katz approach to search analysis-is incorrect and must be changed.
¶123 As noted, the “expectations” approach is problematic for a number of reasons. For one thing, the test is circular in that our expectations and the risks we assume are the product of what the law allows while the law, conversely, is the manifestation of our values and expectations. See ¶¶ 93, 104, supra. If the Legislature passed a law making it unlawful for anyone to record a conversation without the *545 knowledge of all parties to the conversation, one could argue that society is prepared to recognize as reasonable a privacy expectation against the surreptitious recording of conversations — which Allen in fact argues here based on § 45-8-213(l)(c), MCA. But what if the Legislature repealed that law? Or, better yet, what if the Legislature excepted the police from the law’s coverage and adopted a resolution stating that society is unwilling to recognize as reasonable an expectation against warrantless participant monitoring and recording? Would this law violate our decision in Goetz, or would it overrule Goetz by clarifying that society’s expectations are not what we thought they were? Is the Legislature better suited to say whether society is prepared to recognize a particular expectation of privacy as reasonable? Do the protections of the Fourth Amendment and Article II, Sections 10 and 11 vacillate with the prevailing political winds?
¶124 Even our own decisions can have the same effect. Prior to Goetz, any expectation that the government first had to obtain a warrant in order to monitor or record a person’s conversations with an informant was arguably unreasonable, due to authorities such as Coleman and Brown. In this regard, the State points out that “[i]t is illogical that society would view as reasonable a privacy expectation that conflicted with established law.” Of course, it’s possible that this expectation was reasonable but that we failed to recognize that fact in Coleman and Brown, which would highlight yet another flaw in the approach: this Court’s inability to discern accurately which privacy expectations society is prepared to recognize as reasonable. But, in any event, such an expectation is now reasonable under the authority of Goetz. The reason: We simply decided in Goetz that society was prepared to recognize as reasonable an expectation that the government is not monitoring or recording our conversations, regardless of the auditor’s consent.
¶125 This points up another problem with the test: How do we know whether society is prepared to recognize a particular expectation as reasonable? Is it possible to know this without surveying our citizens? Do the parties need to provide us with concrete evidence of society’s views on the matter? The Court’s lack of citation to any such evidence in the present case reflects the fact that none was presented. Allen cites an “empirical study,” but the State points out that this study is inapposite to the issue of participant recording. And while a handful of Convention delegates commented on the issue almost 40 years ago, their views are certainly open to more than one interpretation, as Justice Rice’s Dissent reflects. See also e.g. Keller v. Smith, 170 Mont. *546 399, 408-09, 553 P.2d 1002, 1008 (1976) (“[W]e have not relied on the minutes of the Constitutional Convention proceedings as indicative of the intent of the delegates. We have purposely refrained from using this basis of interpretation as excerpts from various portions of these minutes, among other things, can be used to support either position, or even a third position ....”). The reality is that the privacy expectations which society is prepared to recognize as reasonable are simply the privacy expectations that a majority of the members of this Court decide are reasonable. Again, I disagree with the premise that the constitutional protections were intended to be left to the whims of judges who may think that one expectation of privacy is objectively reasonable and another is not.
¶126 Finally, aside from the impracticality of the test, the reasonableness of a person’s expectation of privacy does not, in my view, tell us whether the police are conducting a “search.” As explained above, the “expectations” test evolved in the Supreme Court’s Lopez, Hoff a, and Katz decisions as a method for determining whether a defendant’s right of“privacy” had been infringed. In fact, under federal law, “privacy” analysis has totally supplanted “search” analysis. And since this Court has adopted wholesale the Supreme Court’s approach, as summarized by Justice Harlan in his Katz concurrence, there is no distinct “search” analysis under Montana law either.
¶127 Yet, there should be. As noted, I do not agree with the proposition that the right of “privacy” and the right against unreasonable “searches” are one and the same. See ¶ 94, supra. And the Montana Constitution, in fact, treats “privacy” and “searches” separately. Article II, Section 10 ensures the right of individual privacy, but Article II, Section 11 ensures a substantively different right: the right to be secure in one’s person, papers, home, and effects from unreasonable searches. It is error to treat these two provisions as creating just one single right of “privacy.”
¶128 Thus, while an analysis of “risks” or “expectations” may be relevant for resolving questions of “privacy,” it is not, in my view, proper for resolving questions of “search.” Again, as pointed out before, a “search” is “an endeavor to find, ascertain, recover, or the like; . . . hence, pursuit with a view to finding, etc.” Webster’s New International Dictionary of the English Language 2257 (2d ed. 1934); see also e.g. Arthun, 274 Mont. at 88, 906 P.2d at 220 (a “search” is “ ‘a prying into hidden places for that which is concealed’ ”). And to “search” means “ ‘[t]o look over or through for the purpose of finding something; to explore; to examine by inspection.’ ” Kyllo, 533 U.S. at 32 n. 1, 121 *547 S. Ct. at 2042 n. 1. The fallacy of the Katz test is that it very deftly shifts the focus from what the government is doing-looking for evidence-to what society accepts, or what the courts deem reasonable, or whether the evidence-gathering technique is utilitarian. In accordance with the plain meaning of the word “search,” I would put the focus back on what the government is doing and hold that a search occurs where a government agent looks over or through, explores, examines, inspects, or otherwise engages in conduct or an activity designed to find, extract, acquire, or recover evidence. A few additional observations about this approach are necessary.
¶129 First, the protection guaranteed by Article II, Section 11 is that the “people” shall be “secure” in their “persons, papers, homes and effects” from unreasonable searches.[4] Thus, the protection applies to “people,” not places, and is only triggered when the government’s searching involves an individual’s person, papers, homes, or effects. Moreover, if the individual knowingly chooses to expose her person, papers, home, or effects to the public or to someone she knows to be a law enforcement agent, then she cannot complain that her “security” has been infringed. For this reason, I would distinguish situations where the speaker knows he is talking to a government agent (e.g., Lopez) from situations where the agent’s connections to the police are kept hidden (e.g., On Lee, Hoffa, and White). Cf. United States v. Stringer, 535 F.3d 929, 939 (9th Cir. 2008) (“[A] search is unreasonable, even if consensual, if the consent is obtained by trickery or deceit.”); ¶ 105, supra (explaining that consent to a warrantless search must be given voluntarily, i.e., must be the product of a free and deliberate choice rather than intimidation, coercion, or deception).
¶130 Second, it is important to note that this approach does not require us to judge the “utility” of a particular police practice. It simply requires that when the practice involves finding, extracting, acquiring, or recovering evidence from a person, the police must first procure a warrant (or the person’s consent) and the search must be otherwise reasonable. Also, in this regard, I do not propose to outlaw all police stratagems and all monitoring or recording of conversations by the police. Rather, my argument is that the Constitution requires that those activities be conducted with a warrant, absent there being an established and well-recognized exception to the warrant requirement.
*548 ¶131 Lastly, search analysis in Montana is typically conducted under Article II, Section 11 in conjunction with Article II, Section 10. See State v. Cotterell, 2008 MT 409, ¶ 25, 347 Mont. 231, 198 P.3d 254; Goetz, ¶¶ 25-27. The latter states that “[t]he right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest.” Mont. Const, art. II, § 10. Based on this provision, we have said that Montanans enjoy “greater protections against governmental intrusions” than those provided under the United States Constitution. State v. Graham, 2007 MT 358, ¶ 12, 340 Mont. 366, 175 P.3d 885. I would continue to recognize these greater protections when conducting search analysis under Section 11.
Allen and Golie’s Telephone Conversation
¶132 Applying these principles to Allen and Golie’s telephone conversation, there is no question that Golie was a government agent who was enlisted to aid in an investigation of Allen, which included surreptitiously recording her telephone conversations with him. Hence, the State was engaged in acquiring verbal evidence from Allen and, thus, was conducting a “search.” That the State was endeavoring to find something (in particular, Allen’s thoughts and communications about illegal activity) is reflected in the fact that it had to use surreptitious methods in order to gain access to what it sought.
¶133 Allen did not knowingly choose to expose his verbalized thoughts to the public generally or to law enforcement specifically. In this connection, I reject the notion that Golie’s so-called “consent” to record her conversations with Allen at the behest of the police nullified the warrant requirement. It is axiomatic that Golie cannot waive Allen’s right against unreasonable searches under Article II, Section 11 (or, for that matter, his right of privacy under Article II, Section 10) any more than he can waive hers. I also reject the proposition that Allen surrendered his right against unreasonable searches just because he communicated his thoughts to Golie. It is well-established by cases such as Silverman, Wong Sun, Katz, and Goetz that the constitutional protections encompass verbalized thoughts.
¶134 Finally, law enforcement’s evidence-gathering activities here resulted in two types of evidence: Golie’s testimony about her conversation with Allen, and the recording she made of that conversation. Both, in my view, are the product of an unlawful warrantless search and, thus, both are subject to suppression. As discussed above, I am not persuaded that one type of evidence is the result of a search and the other is not. Such a distinction depends on *549 ad hoc judgments about “risks,” “expectations,” and the desirability of the particular police practice used. These considerations have no bearing on the question of whether a “search” has occurred.
¶135 In conclusion, for the purpose of conducting search analysis under Article II, Section 11,1 believe we should jettison the Katz test in favor of a plain interpretation of the word “search.” Applying that here, I conclude that enlisting Golie to acquire evidence against Allen was a search requiring a warrant.
III. Exclusionary Rule Analysis
¶136 The second primary point addressed in this concurrence concerns application of the exclusionary rule to Golie’s testimony about her conversation with Allen. For the reasons just discussed, I conclude that this evidence was the product of an unlawful warrantless search. But that conclusion aside, I believe Golie’s testimony should be subject to the exclusionary rule as well.
¶137 “The exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search and of testimony concerning knowledge acquired during an unlawful search.” Murray v. United States, 487 U.S. 533, 536, 108 S. Ct. 2529, 2533 (1988) (citations omitted). The purpose of the exclusionary rule is to deter illegal police conduct and constitutional violations and to preserve judicial integrity. State v. Ellis, 2009 MT 192, ¶ 48, 351 Mont. 95, 210 P.3d 144; Virginia v. Moore, 553 U.S. 164, 178, 128 S. Ct. 1598, 1608 (2008) (citing Wong Sun v. United States, 371 U.S. 471, 484-85, 488, 83 S. Ct. 407 (1963)). “The exclusionary prohibition extends as well to the indirect as the direct products of [unlawful searches].” Wong Sun, 371 U.S. at 484, 83 S. Ct. at 416.
¶138 In the instant case, as in Goetz, it is undisputed that Golie, a confidential informant, was acting as an agent of the State when she surreptitiously recorded her cell phone conversation with Allen at the behest of law enforcement. The Court holds that this warrantless recording of the conversation violated Allen’s right to be free from unreasonable searches and seizures under Montana’s Constitution, Article II, Section 11, as bolstered by the right of individual privacy, Article II, Section 10. Opinion, ¶ 64. The Court thus directs that the recording may not be admitted into evidence in the event of a retrial. Opinion, ¶ 65.
¶139 Yet, while we suppress the recording itself, the Court leaves open the possibility that the agent who unlawfully made it can still be called to testify personally about the substance of the recording. The *550 recording is suppressed; its contents are not. In my view, however, Golie’s testimony ought to be suppressed as well. Allen’s right to be free from unreasonable searches and invasions of privacy is compromised not only by the admission of the warrantless recording, but, equally so, by the testimony of the government agent as to her recollections of what was said in the conversation. If the government acquires verbal evidence by means of a warrantless search, then suppressing the recording of the conversation, but not the conversation itself, effectively eviscerates the rights sought to be protected. Our decisions today and in Goetz go only half way; they stop short of fully protecting the right of individual privacy and the right to be free from unreasonable searches.
¶140 As noted at the outset, this approach of suppressing the recording, but not the conversation itself, is akin to suppressing evidence obtained by means of an unlawful entry into the defendant’s home, but then allowing the officers to testify about that evidence and the fact that they found it in the defendant’s home. While the Court asserts that this analogy fails, see Opinion, ¶ 65 n. 2, it appears that the Court has simply missed the point. Allowing an agent to testify about evidence which he acquired through an illegal search, and which has therefore been suppressed, defeats the purpose of the exclusionary rule-which, it must be recalled, is intended to deter constitutional violations, applies to indirect as well as direct evidence, and includes knowledge acquired during an unlawful search. Obviously, there is little, if any, deterrent when the prosecution is permitted to introduce otherwise excluded evidence through the mere expedient of having one of its witnesses describe that evidence to the jury. In this regard, we must not forget that Allen’s objection is not so much to the recording itself as it is to the contents of the recording. Surely we would not be here debating this issue if all that Golie had managed to record was perfectly innocuous statements. Again, it is the evidence of his inculpatory statements which Allen seeks to suppress. And if the mechanical evidence of those statements must be suppressed as the product of a constitutional violation, then so too should the verbal evidence (i.e., the agent’s testimony about them) if the exclusionary rule is to serve its function.
¶141 Notably, the Court proffers a distinction between the illegal intrusion in my hypothetical and the illegal intrusion in the present case. The Court suggests that whereas my hypothetical officer would not have been in the house to make his observations but for his illegal entry, Allen invited Golie to participate in a conversation with him *551 and, thus, she was lawfully present to hear his verbalized thoughts. Her illegal act, according to the Court’s holding under Issue 2, was to record those thoughts as they were being expressed. Thus, since “Golie’s engaging in a cell phone conversation with Allen is not poisoned by the fact of the recording,” Opinion, ¶ 65 n. 2, we presumably need not suppress her testimony about the conversation under the exclusionary rule.
¶142 For reasons discussed in Part II above, I suggest that the “poisonous tree” in cases such as this is not the mere fact of the recording. Rather, it is the fact of gathering evidence from the defendant without a warrant, with the recording being just one fruit on that tree. Nevertheless, for purposes of the present case, treating “the fact of the recording” as the poisonous tree is arguably correct, given that Allen requested suppression of only the recording, and not Golie’s testimony about their conversation. However, the Court’s dictum on this matter-consisting of two conclusory sentences at the end of a footnote regarding an issue that wasn’t even raised-is far from a holding. In this regard, and for clarification, I note that my argument herein is not that we should grant Allen relief that he did not request. Rather, the purpose of this concurrence is to point up the problematic aspects of the Katz “expectations” test and the illogicality of suppressing the recording but not the agent’s testimony. Ultimately, a definitive holding on the question of whether the State’s warrantless acquisition of a person’s verbalized thoughts is unlawful, whether or not a recording device is used, must await a future case where the issue is squarely presented for decision.
IV. Conclusion
¶143 The rule we should adopt for search-and-seizure analysis is a simple one. When the government looks over or through, explores, examines, inspects, or otherwise engages in conduct designed to find, extract, acquire, or recover evidence, it is a “search,” and when the search implicates an individual’s person, papers, homes, or effects, it must be conducted with a warrant or in reliance on one of the well-recognized exceptions to the warrant requirement. Whether the courts deem the defendant’s expectation of privacy as reasonable and whether we believe the evidence-gathering technique is sufficiently utilitarian are not part of the equation. Likewise, it does not matter whether the search is conducted by law enforcement directly or, as here and in Goetz, indirectly by means of government agents. Finally, all evidence gathered as a result of an illegal search must be suppressed. Where *552 verbal evidence is concerned, that includes the conversations themselves as well as the recordings of the conversations. Both are evidence obtained by constitutionally impermissible means.[5]
¶144 If Article II, Section 11 means anything, this constitutional right requires scrupulous adherence to the warrant requirement when the government engages in evidence-gathering activities which implicate an individual’s person, papers, home, or effects. That constitutional mandate is not lessened, and cannot be avoided, by using an agent to obtain evidence which the government could not obtain directly through a law enforcement officer. How and through whom the government conducts its evidence-gathering activities and what form the government uses to preserve the evidence it acquires (whether a recording or the agent’s memory) are immaterial. Without a warrant, all evidence gathered by the government as a result of the warrantless and illegal search should be suppressed.
¶145 I specially concur.

 Minnesota v. Carter, 525 U.S. 83, 97, 119 S. Ct. 469, 477 (1998) (Scalia & Thomas, JJ., concurring).

 See ScienceDaily, Mind Reading, Brain Fingerprinting and the Law, http://www.sciencedaily.com/releases/2010/01/100120085459.htm (Jan. 24, 2010).

3 Earlier in his dissent, Justice Brennan explained that a mechanical recording is “independent evidence” of the person’s statements, as opposed to evidence that merely repeats or corroborates the agent’s testimony. Lopez, 373 U.S. at 448, 83 S. Ct. at 1392-93.

 Searches conducted without a warrant are per se unreasonable, subject to only a few carefully drawn exceptions. Arizona v. Gant, 129 S. Ct. 1710, 1716 (2009); State v. Hurlbert, 2009 MT 221, ¶ 19, 351 Mont. 316, 211 P.3d 869.

 As a corollary to this, I have previously argued that an officer’s personal, direct observations made independently of the warrantless audio or visual recordings would not necessarily have to be excluded, though his characterizations of the recording’s substance should be. See State v. Foston, 2009 MT 191, ¶¶ 22-25, 351 Mont. 85, 209 P.3d 262 (Nelson, J., specially concurring). Notably, at the Foston orad argument, in response to questioning from the Court, the Attorney General assured the Court that “post-Goefz, we wouldn’t be getting into this sort of thing”-i.e., an officer testifying as to the substance of an illegally obtained recording-“because under Goetz, we need a warrant to get into any evidence regarding electronic surveillance.” See Foston, ¶ 27.